COPPER VALLEY MACHINE
WORKS, INC., Appellant,

v.

Cecil D. ANDRUS, Secretary of the
Department of Interior, et al.

No. 79–1994.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1980.

Decided April 23, 1981.

John H. Pratt, District Judge for the
District of Columbia, sitting by designation,
filed opinion concurring in the remand.

Everard A. Marseglia, Jr., Washington, D. C., for appellant; A. Karen Hill, Washington, D. C., was on the brief, for appellant.

Jerry Jackson, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Lawrence R. Liebesman and Edward J. Shawaker, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before TAMM and MacKINNON, Circuit Judges and PRATT *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

Concurring opinion filed by District Judge JOHN H. PRATT.

MacKINNON, Circuit Judge.

The principal issue in this appeal is whether a restriction in a drilling permit prohibiting summer drilling in the interest of conservation worked a "suspension of operations and production" that would extend the life of an oil and gas lease under section 39 of the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 209.

## I. BACKGROUND

Effective February 1, 1966, the Secretary of Interior issued oil and gas lease A–063937 to run for an initial "period of ten years and so long thereafter as oil or gas is produced in paying quantities." (Appellant's Exhibit (App.Ex.) A at 3.)

Near the end of the primary lease term, Copper Valley Machine Works, Inc. (Copper Valley), the designated operator of the lease,[1] asked the Oil and Gas Supervisor of the United States Geological Survey about "extending the 10-year lease term by drilling across the expiration date."[2] Subse-

quently Copper Valley filed for the Supervisor's consideration an application for a permit to drill. On January 30, 1976 the drilling permit application was approved,

> subject to conditions attached to the permit and conditions and requirements described below:
>
> * * * * * *
>
> 10. The approved application and development plan provides for operation *during the winter season only*, as approved by the appropriate surface managing agency.

(App.Ex. F at 2) (emphasis added). This "winter season only" restriction was considered "necessary because the lease itself was issued without any stipulations for protection of the tundra/perma-frost environment during the months of summer thaw." (App.Ex. V at 3.)

### A. Subsequent History

The events that then led to this dispute are described in a memorandum from the Acting Director of the Geological Survey to the Secretary of Interior:

> The well was commenced on January 31, 1976 (the expiration date of the primary term), and reached a depth of 100 feet before having to shutdown for the 1976 summer season. Following the summer shutdown from May to November 1976, operations were recommenced on February 5, 1977, and after reaching a depth of 1,070 feet on March 20, 1977, electric logs were run in the well. After evaluating the electric logs and examining the samples, the Supervisor concluded that the operator had satisfied the "diligent drilling" requirements of 43 CFR 3107.2–3,[3] and recommended to BLM that the lease be extended to January 31, 1978.

The primary term of a lease is extended for two years upon a finding of diligent drilling on the lease prior to and at the lease's expiration. *See* 43 C.F.R. § 3107.2–3 (quoted at note 3 *infra*).

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Although Copper Valley is not the actual lessee we shall refer to it as such hereafter for convenience. The distinction between a designated operator and a lessee is inconsequential *for the purposes of this opinion.*

2. Memorandum from Acting Director, United States Geological Service to Secretary of Interior (March 30, 1978), *reprinted in* Appellant's Exhibit (App.Ex.) V at 2 (hereafter cited to App.Ex. only).

3. 43 C.F.R. § 3107.2–3. *Period of extension.*
 *Any lease* on which actual drilling operations, or for which under an approved cooperative or unit plan of development or operation, actual drilling operations were commenced prior to the end of its primary term and are being diligently prosecuted at that

After the 1977 summer shutdown, the Supervisor advised the operator and the lessee that the lease would expire January 31, 1978, absent a well physically and mechanically capable of production in paying quantities by that date.

On January 20, 1978, the operator wrote the Supervisor and requested that the lease be extended for twelve (12) months to compensate for the two periods of summer shutdown in 1976 and 1977. The Supervisor considered this letter to be *an application to the Secretary* for an extension of lease Anchorage 063937 pursuant to 43 CFR 3103.3–8 [4] [Emphasis added.]

Although acknowledging that Copper Valley had been "unable to conduct operations on a full-time basis since January of 1976 by the imposition of the requirement that operations would be permitted only during the winter months," (App.Ex. V at 4), the Acting Director recommended that no extension of the lease be granted or recognized.

On May 22, 1978, the Secretary of Interior followed the Acting Director's recommendation, ruling that

the lease is considered to have expired by operation of law as of midnight, January 31, 1978, absent the existence of a well on that date which had been determined by the Supervisor as capable of producing in paying quantities. The reasons for the denial [of extension] are that (1) the lessee accepted the imposed restriction that

time, *shall be extended for 2 years* and so long thereafter as oil or gas is produced in paying quantities.
(Emphasis added.)

4. 43 C.F.R. § 3103.3–8 provides:
*Suspension of operations and production.*
(a) Application by lessees for relief from the producing requirements or from all operating and producing requirements of mineral leases shall be filed in triplicate in the office of the Area Oil and Gas Supervisor for oil and gas leases and in the office of the Area Mining Supervisor for all other leases. By Departmental Order No. 2699 and Geological Survey Order No. 218 of August 11, 1952, the Regional Oil and Gas Supervisors and the Regional Mining Supervisors are authorized to act on applications for suspension of operations or production or both filed pursuant to this section and to terminate suspensions of this kind which have been or may be granted. As to oil and gas leases, no suspension of operations and production will be granted on any lease in the absence of a well capable of production on the leasehold, except where the Secretary directs a suspension in the interest of conservation. Complete information must be furnished showing the necessity of such relief.
(b) The term of any lease will be extended by adding thereto any period of suspension of all operations and production during such term pursuant to any direction or assent of the Secretary.
(c) A suspension shall take effect as of the time specified in the direction or assent of the Secretary. Rental and minimum royalty payments will be suspended during any period of suspension of all operations and production directed or assented to by the Secretary, beginning with the first day of the lease month on which the suspension of operations and production becomes effective or, if the suspension of operations and production becomes effective on any date other than the first day of a lease month, beginning with the first day of the lease month following such effective date. The suspension of rental and minimum royalty payments shall end on the first day of the lease month in which operations or production is resumed. Where rentals are creditable against royalties and have been paid in advance, proper credit will be allowed on the next rental or royalty due under the lease.
(d) No lease shall be deemed to expire by reason of a suspension of either operations or production only, pursuant to any direction or assent of the Secretary.
(e) If there is a well capable of producing on the leased premises and all operations and production are suspended pursuant to any direction or assent of the Secretary, the commencement of drilling operations only will be regarded as terminating the suspension as to operations but not as to production, and as terminating the period of suspension to be added to the term of the lease as provided in paragraph (b) of this section and the period of suspension of rental and minimum royalty payments as provided in paragraph (c) of this section. However, as provided in paragraph (d) of this section, the term of the lease will not be deemed to expire so long as the suspension of operations or production remains in effect.
(f) The relief authorized under this section may also be obtained for any oil and gas leases included within an approved unit or cooperative plan of development and operation.

drilling could be conducted only during the winter season without complaint until 11 days preceding the lease expiration date and (2) the 2-year lease extension earned by drilling across the end of the primary term of January 31, 1976, afforded sufficient additional time, despite the restriction, in which to have completed a well that was physically capable of production in paying quantities.

Memorandum from Acting Chief, Conservation Division to Conservation Manager, Western Region (June 14, 1978), *reprinted in* App.Ex. V at 1.

### B. Decision of the District Court

On July 17, 1978, Copper Valley was advised of the Secretary's May 22nd action, and on August 18 sought a declaratory judgment in the United States District Court for the District of Columbia that the Secretary's refusal to permit another 12 months of operations was unlawful. Copper Valley relied on section 39 of the Mineral Leasing Act of 1920, as amended, which provides in part:

> In the event the Secretary of Interior *in the interest of conservation*, shall direct . . . *the suspension of operations and production* under any lease granted under the terms of this Act, any payment of acreage rental or of minimum royalty prescribed by such lease likewise shall be suspended during such period of suspension or operations and productions; *and the term of such lease shall be extended*

*by adding any such suspension . . . thereto.*

30 U.S.C. § 209 (emphasis added).[5]

On the parties' cross-motions for summary judgment, the district court ruled in favor of the Secretary. *Copper Valley Machine Works, Inc. v. Andrus*, 474 F.Supp. 189 (D.D.C.1979). The court reasoned that drilling permit restrictions, which the lessee had agreed to accept in signing the lease, did not amount to a "suspension of operations and production" because Congress meant to apply that phrase only to

> extraordinary situations where the Secretary orders the suspension of drilling to the surprise of the lessee in order to conserve oil and gas or where the lessee requested and the Secretary assented to a suspension. See H.R.Rep. No. [1737, 72d Cong., 1st Sess. 3 (1932)] and 76 Cong. Rec. 705 (Dec. 19, 1932).

*Id.* at 192. The court also indicated that Copper Valley's action was untimely inasmuch as the Secretary's imposition of the "winter season only" restriction in the drilling permit of January 30, 1976 triggered the 90 day period for seeking judicial review of adverse agency action. *Id.* (citing 30 U.S.C. § 226–2). This appeal followed.

### II. ANALYSIS

Copper Valley's principal contention on appeal is that the drilling permit's "winter season only" restriction, by preventing drilling operations for 6 summer months a year, worked a "suspension of operations and pro-

---

5. Section 209 reads in full:

§ 209. Suspension, waiver, or reduction of rents or royalties to promote development or operation; extension of lease on suspension of operations and production.

The Secretary of the Interior, for the purpose of encouraging the greatest ultimate recovery of coal, oil, gas, oil shale, phosphate, sodium, potassium and sulphur, and *in the interest of conservation of natural resources*, is authorized to waive, suspend, or reduce the rental, or minimum royalty, or reduce the royalty on an entire leasehold, or on any tract or portion thereof segregated for royalty purposes, whenever in his judgment it is necessary to do so in order to promote development, or whenever in his judgment the leases cannot be successfully operated under the terms provided therein. In the event the Sec-

retary of the Interior, *in the interest of conservation*, shall direct or shall assent to the suspension of operations and production under any lease granted under the terms of this chapter, any payment of acreage rental or of minimum royalty prescribed by such lease likewise shall be suspended during such period of suspension of operations and production; and the term of such lease shall be extended by adding any such suspension period thereto. The provisions of this section shall apply to all oil and gas leases issued under this chapter, including those within an approved or prescribed plan for unit or cooperative development and operation. Nothing in this section shall be construed as granting to the Secretary the authority to waive, suspend, or reduce advance royalties. (Emphasis added).

duction" "in the interest of conservation" and therefore, under § 209, mandated an automatic extension of the lease for a period equal to the length of the suspension. The Government responds that the drilling restrictions did not create suspensions within the meaning of § 209.

### A. "In the Interest of Conservation"

■ We note at the outset that there is no contention that the "winter season only" restriction was not ordered "in the interest of conservation." The parties agree that carrying on drilling operations during the summer months would have substantially

damaged the permafrost character of the leasehold area. Preventing such damage is obviously in the interest of conservation if that term is to receive its ordinary meaning. While the prevention of environmental damage may not have been the "conservation" that Congress principally had in mind in 1933 when it passed § 209,[6] suspending operations to avoid environmental harm is definitely a suspension in the interest of conservation in the ordinary sense of the word.[7] And there was no indication that Congress intended that "conservation" be given any interpretation other than its ordinary meaning.[8]

6. A congressional report accompanying the bill that became § 209 stated:

> [I]t is . . . a matter of public knowledge that there has existed for some time past, and still exists, a condition of overproduction [of petroleum and natural gas]. This condition has resulted in the adoption by the Interior Department of an administrative policy of conservation of oil and gas.

H.R.Rep.No. 1737, 72nd Cong., 1st Sess. 3 (1932).

7. The concurring opinion asserts that "conservation" applies only to the conservation of exploitable natural resources such as oil and gas "and not to more general environmental protection measures which may restrict production." Concurring Opinion (Conc.Op.) at 607. Under this view, the "winter season only" drilling restrictions could not have been imposed "in the interest of conservation" within the meaning of § 209 and therefore no lease extension is warranted, regardless of whether the drilling restrictions effected a § 209 "suspension of operations and production." The concurrence makes two contentions in support of this argument that "conservation" should be construed narrowly: (1) the legislative history focuses on the problem of overproduction of oil and gas, and (2) the Secretary of Interior has adopted a narrow construction of "conservation." Neither contention bears the weight the concurrence would have it hold.

First, the legislative history of § 209 does not act to limit the plain import of "conservation," which in this century has always included the preservation of natural resources generally. Congress chose a general phrase—"in the interest of conservation"—to define the scope of circumstances under which oil and gas lessees would be given relief from government-imposed suspensions of their drilling operations. That the immediate occasion of the congressional action was a series of suspensions imposed in order to save oil and gas cannot be decisive, for

> Congress surely may use the lesson of a particular historical period as the catalyst for

a law of more general application. For this reason, among others, the rule is well established that construction of a statute begins with its language; indeed, where there is no ambiguity in statutory language, there may be no need to refer to legislative history at all.

*Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1335 (7th Cir. 1977).

Accordingly, absent an affirmative showing that Congress did not intend to give "conservation" its ordinary meaning, we should honor the congressional choice of language unless it produces results so unreasonable or arguably unconstitutional that Congress must be presumed to have used the term in a different sense.

There is no such affirmative showing in the legislative history here. The concurrence relies on the proposition that the plain meaning of a statutory term can be altered when the statute or its legislative history reveals an intent to adopt the special meaning that the term has within a particular trade or science. Conc.Op. at 608. While acknowledging the obvious validity of this proposition, we question its application here. This is not a case, such as *Corning Class Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), in which the term in question was adopted by Congress, at the suggestion of experts within a particular field, in order to refine a statutory definition. See *id.* at 198–202, 94 S.Ct. at 2229 (where Congress, at suggestion of industrial relations experts, added "similar working conditions" to make less vague the equal-pay-for-equal-work concept of the Equal Pay Act, "working conditions" would be given the special meaning the experts gave it). The mere fact that Congress at that time was primarily concerned with "conservation" in the production of oil, see note 6 *supra,* Conc.Op. at 607 & nn.1–3, does not justify an interpretation that restricts "conservation" solely to oil. *See, e. g., Stern v. United States Gypsum, Inc., supra.*

Nor are the results of applying its ordinary meaning to "conservation" so unreasonable as to compel us to presume that Congress had a crabbed construction in mind. It was the inequity of depriving oil and gas lessees of drilling time without any extension of their leases that moved Congress to enact § 209, see p. 602 *infra*, and a suspension to preserve tundra/permafrost environment is as devastating in its effect on an oil and gas lessee as is a suspension merely to save oil and gas. Applying "conservation" to *all* natural resources advances the policy of § 209; this interpretation is not unreasonable or arguably unconstitutional and there is no indication Congress would disapprove of the result it produces. *Cf. Maine v. Thiboutot*, 448 U.S. 1, 7, 100 S.Ct. 2502, 2502, 65 L.Ed.2d 555 (1980) (42 U.S.C. § 1983's protection against violations of "the Constitution *and laws*" applies to *all* federal laws even if *principal* purpose of "and laws" was to include equal rights statutes; "the legislative history does not demonstrate that the plain meaning was *not* intended" (emphasis added)).

The concurrence contends that we owe great deference to the Secretary of Interior's interpretation of § 209. We agree, but consider that it supports our view rather than that of the concurrence. Perhaps the best evidence of the Secretary's interpretation of § 209 as it affects this case is the argument made on his behalf in the district court and here on appeal. This alone refutes any assertion that the Department of Interior has adhere[d] to the [narrow] mineral conservation rationale," Conc.Op. at 608, for the Department has taken no issue with Copper Valley on the meaning of "in the interest of conservation"; it instead has argued that the drilling restrictions does constitute a § 209 suspension. *See, e. g.*, Secretary's Brief at 8.

Moreover, the authorities cited to show the Secretary adhering to a narrow meaning of "conservation" are not helpful to the concurrence for they do not involve factual situations which squarely presented the issue of whether conservation should be given its plain meaning, or construed narrowly.

Far more to the point are departmental interpretations that advocate giving the same plain meaning to "conservation" that we think is appropriate here. Two instances of such interpretations appear in a July 1975 opinion letter prepared by the Assistant Solicitor of the Minerals Division of Energy and Resources, *reprinted in* Appellant's Brief appendix C. The letter concludes that *suspensions of operations to permit the completion of environmental studies are cognizable under § 209*. As one example of § 209's application the letter cites the 1971 suspension on operations and production on 163 federal oil and gas leases in the Ocala National Forest of Florida "for the express purpose of allowing sufficient time for the Department to determine whether additional terms

and conditions should be imposed *to prevent damage to the environment* within that national forest." *Id.* at 1 (emphasis added). The Assistant Solicitor considered that this suspension in the interest of conserving nonexploitable natural resources was within the scope of § 209, because

[t]here is no indication in [the section] that a suspension is to be merely for the conservation of the resources subject to the lease or even of the resources subject to the Mineral Leasing Act. Instead the normal reading is that it should be *for the conservation of all natural resources*.

*Id.* at 1–2. (emphasis added) The Assistant Solicitor continued,

When Section 39 [codified at 30 U.S.C. § 209] was added to the Mineral Leasing Act in 1933, the long delays for environmental studies which we now experience were not expected but, nevertheless, Congress provided the means by which the Secretary could see to it that, despite the long delays inevitable in the compliance with NEPA procedures, lessees would not lose any of the time to which they are entitled. Congress has determined that the holder of a noncompetitive oil and gas lease should have a full ten years in which to develop the resources subject to his lease. The Congress has also directed the Secretary to engage in lengthy environmental studies. The only way in which these two purposes of Congress can be effectively reconciled is by authorizing suspension and consequent extension. Accordingly, it is my view that the Department ought in all cases, where the preparation of an environmental impact statement or other environmental studies is required, to suspend operations and thus assure the lessee that he will receive an extension comparable to the period during which operations are prohibited and thus not be deprived of any of the development period which the Congress has granted him.

These interpretations, and others (see note 8 infra), are far more relevant to the scope of § 209 than are departmental statements not directly addressed to the scope of the term "conservation" (see Conc.Op. at 607 & nn. 2–4). These interpretations indicate at the very least the absence of any consistent departmental adherence to an unnaturally narrow view of "conservation". They confirm rather than refute our impression that "conservation" should be given its ordinary meaning.

8. This conclusion is consistent with *Gulf Oil Corp. v. Morton*, 493 F.2d 141 (9th Cir. 1974). The court in *Morton* interpreted § 5(a)(1) of the Outer Continental Shelf (OCS) Lands Act, 43 U.S.C. § 1334(a)(1), a provision similar to 30 U.S.C. § 209. Section 5(a)(1) authorizes the Secretary of Interior to provide, "in the interest of conservation," for the "suspension of operations or production." The court rejected the oil

B. "Suspension of Operations and Production"

1. The Secretary's "Surprise Theory"

■ The Secretary asserts that § 209 "was designed by Congress to cover only unanticipated interruptions of drilling." Appellee's Brief at 13. Under this view, whether a § 209 suspension has occurred depends on whether the "winter season only" restriction was a surprise to Copper Valley. It is in this context that the Secretary emphasizes that the lease gave "notice that drilling activities would be subject to restriction," that Copper Valley "did not protest against the restriction until two years after the permit was issued," and that Copper Valley "continued to pay rent during the thaw months without attempting to assert that the drilling permit condition was a surprise." *Id.* We find it unnecessary to consider whether summary judgment was appropriate on the question whether Copper Valley could foresee the suspension of drilling, for we reject as unpersuasive the Secretary's attempt to narrow the scope of the plain terms of § 209.

As indicated in note 6 *supra*, § 209 was enacted in a period when the Secretary was suspending the drilling operations of oil and gas lessees in order to alleviate the problem of excess petroleum production. The congressional report explained that the bill

> relieve[s] lessees of coal and oil lands from the necessity of paying prescribed annual acreage rental, during periods

company's argument that "interest of conservation" is confined to conservation of oil and gas, *id.* at 145, and concluded the Secretary was empowered to suspend drilling operations to prevent undue harm to the marine environment.

The court noted that the first portion of § 5(a)(1) mentioned "conservation of natural resources" and reasoned that the later phrase "in the interest of conservation" was a reference back to "natural resources." "Its natural meaning," the court observed, "would encompass all such resources, not just oil and gas, sulphur and other minerals." *Id.* at 144, 145. (Section 209 also precedes "in the interest of conservation" with "conservation of natural resources," a phrase Congress added in 1946. 60 Stat. 957. See note 5 *supra*.)

The *Morton* court also relied on the legislative history of the OCS Lands Act, as the Concurring Opinion notes, Conc.Op. at 609 n.7, but that reliance was merely supportive of a plain reading of the statute. That similarly affirmative support for a broad reading of "conservation" is absent in the legislative history of § 209 is no reason to discard a plain reading of the section. Rather, the relevant consideration is that there is no legislative history to *contradict* a plain reading. Particularly illustrative of this point is the concurrence's reliance on an Interior Department opinion in claiming that:

> the legislative history shows that Congress intended "conservation" to be interpreted far more broadly in the OCS Lands Act than it was in the Mineral Leasing Act. *Suspension of Operations on Oil and Gas Leases*, 78 I.D. 256, 258–60 (1971) (opinion of Interior Dept. Solicitor). Congress used "conservation" differently in § 209. [Conc.Op. at 609 n.7.]

In light of this claim the *Suspension* opinion itself is worth examining. The issue presented was whether oil drilling operations suspended under the OCS Lands Act for environmental purposes were "suspended in the interest of conservation." The opinion reasoned in part:

> Although the statute authorizes the Secretary to issue regulations for the suspension of operations in the interest of conservation of natural resources the term "conservation" is not defined in the statute, nor is there any explicit definition of the term in the legislative history of the Act. However, conservation is defined in the dictionary as: "1. A conserving, preserving, guarding, or protecting; a keeping in a safe or entire state; preservation. 2. Official care or keeping and supervision, as of a river or forest * * *." Webster, *New International Dictionary* (2d ed. 1943). *Even if the term "conservation" should be limited to its use in the mining industry, a similarly broad definition would be applicable*: "conservation: conserving, preserving, guarding, or protecting; keeping in a safe or entire state; using in an effective manner or holding for necessary uses, as mineral resources." U.S. Department of the Interior, Bureau of Mines, *A Dictionary of Mining, Mineral, and Related Terms* (1968).

78 I.D. at 258 (emphasis added). Then, like the court in *Morton*, the Interior opinion also relied on legislative history, but that language simply confirmed that the Act was to be given its plain meaning. The Interior opinion *does not* contrast the scope of "conservation" under the OCS Land Act with the scope of "conversation" under § 209. Neither it nor any legislative history shows that Congress intended "conservation" to mean one thing in § 209 and something else in a later statute whose language and purpose is in many respects the same.

when operations or production is suspended, in the interest of conservation, either by direction or assent of the Secretary of the Interior, and [provides] that the period of such suspension shall be added to the term of the lease.

. . . .

The obvious fairness of such a provision would seem to render unnecessary any extended comment in its support. That which can not be productive of any returns to the lessee, by reason of the direction or assent of the lessor, should not be made a liability by requiring the lessee to pay annual acreage rental.

. . . .

Where, by reason of the positive directions of the Secretary of Interior, or by mutual assent of the Secretary and of the lessee, production is prohibited from the leased area, the suspension period surely should not be counted as a part of the prescribed term. Hence the provision that such suspension period shall be added to the life of the lease.

H.R.Rep. No. 1737, 72d Cong., 1st Sess. 2–3 (1932).

Because some of the oil and gas lessees who benefitted from the lease extensions and rent moratoriums of § 209 might have been surprised by the petroleum glut and the Secretary's ensuing suspensions, the Government contends that the section, which by its terms applies to any Secretary-imposed "suspension of operations and production," actually applies only to those suspensions that are the product of unanticipated events. To state this contention is to suggest its refutation. The plain meaning of a statute cannot be overcome by speculation as to some unstated purpose. Nothing in the legislative history of § 209 suggests, much less establishes, the narrow interpretation the Secretary would have us adopt. Rather, the history is consistent with the statute's use of the word "suspension" in its unqualified sense: "The very purpose of the bill is to give some equitable consideration to the many leases where the Department of the Interior, by its order, has prohibited production of oil from the leases." 76

Cong.Rec. 705 (1932) (remarks of Representative Eaton). It was further explained: "It seems unfair for the Government to order lessees to refrain from production and then collect rent for the non-production period." *Id.* at 1881 (1932) (remarks of Representative Eaton). Precisely the same rationale underlay the decision to extend leases for the period of the suspension. H.R. Rep. No. 1737, 72d Cong., 1st Sess. 3 (1932). There is no indication that Congress thought it desirable or possible to distinguish between lessees who were surprised by suspensions and those who anticipated them. The Secretary's speculation, suspect on its own terms, has no support in the legislative history and cannot modify the statute's plain terms.

■ We thus find it irrelevant, insofar as extension of the lease is concerned, that Copper Valley paid rent without protest during the two year extension of the ten year primary term. By paying rent Copper Valley protected its rights by eliminating the basis for any contention by the Secretary that it was in default. Whether the lease was extended or not, rent would eventually be due for the full two year period. Now Copper Valley has fully satisfied its rent obligation through the extension period it will receive by virtue of the suspension.

The Secretary also contends that Copper Valley's interpretation of § 209 could double the term of all leases on Alaskan tundra, contrary to the congressional intent that the term of a non-producing non-competitive lease be limited to 10 years, with the possibility of a single 2-year extension. 30 U.S.C. § 226(e). Contrary to the Secretary, we perceive no conflict between Copper Valley's reading of § 209 and a sensible reading of § 226(e). Without undertaking to decide that issue, which is not before us, we note that § 226(e) gives the lessee a minimum number of years in which to develop the resources subject to his lease. Section 209, consistent with this policy, extends the life of the lease to the extent that the lessee is deprived of his full term by the Secretary's suspension of drilling operations

in the interest of conservation. Far from undermining § 226(e), § 209 effectuates the policy it reflects. The law was intended to apply uniformly throughout the United States and give lessees in Alaska the same full term of enjoyment as lessees in the lower 48 states. If climatic conditions in Alaska cause the Secretary to order a suspension in the interest of conservation it is not to be considered as being any the less a suspension because the reason that prompted its imposition was foreseeable.

2. The Secretary's discretion not to invoke a suspension

■ The Secretary argues in the alternative that notwithstanding the terms of § 209, "that section gives the Secretary discretion not to invoke a suspension." Appellee's Brief at 16. It is in this context that the Secretary emphasizes the second reason given for the denial of extension: Copper Valley had had sufficient time to drill several wells in the area under lease.

This position rests upon a misconception of Copper Valley's request for an extension. The Secretary treated the January 20, 1978 letter as an "application by [a lessee] for relief from the producing requirements or from all operating and producing requirements of [its lease]." 43 C.F.R. § 3103.3–8(a), note 4 *supra*. However, Copper Valley has never applied for relief from any producing requirements within the meaning of the regulation. Although some language in the regulation might be construed to favor the Secretary's construction, it is clear that the regulation, when read in its entirety, aims at situations where *lessees* make

> applications for suspension of operations or production or both ... pursuant to this section and to terminate suspensions of this kind which have been or may be granted. As to oil and gas leases, no suspension of operations and production will be granted on any lease in the absence of a well capable of production on the leasehold, except where the Secretary directs a suspension in the interest of conservation. Complete information must be furnished showing the necessity of such relief.

43 C.F.R. § 3103.3–8(a). Here, by contrast, the suspension was not applied for and obtained by the lessee but was *ordered by the Secretary.* This is not a case where the Secretary was asked to invoke a retroactive suspension, but one where he was asked to recognize that a suspension has been invoked by his action. Whatever relevance dilatory drilling may have when the lessee asks for a suspension, it is not a relevant consideration where the suspension has already been directed by the Secretary.

3. The Secretary's Prior Decision in *Texaco, Inc.*

■ Additional support for the conclusion that § 209 required an extension in this case appears in *Texaco, Inc.,* 68 I.D. 195 (1961), a case neither referred to by the Secretary in his decision nor, it appears, brought to the attention of the district court. In *Texaco,* the lessee was denied an oil drilling permit in order to preserve potash deposits. The Secretary held:

> Inasmuch as the record in this case indicates that *the refusal to permit drilling on these leases amounted to an order prohibiting all operations thereon* and that the order was in the interest of conservation, the appellant's application for suspension under § 39 [30 U.S.C. § 209] may be allowed.

*Id.* at 200 (emphasis added). The "winter season only" restriction involved here was not a total refusal to permit drilling but did amount to a refusal to permit drilling for a six month period each year. Under the rationale of *Texaco* this restriction must be interpreted as having caused a six month suspension in each year of Copper Valley's "operations and production."

In this case the district court relied upon a conclusion that all provisions of the drilling permit issued during the primary term of the lease were incorporated into the lease. Assuming this is so, the statute nonetheless mandates that the lease "shall be extended" for the length of the period in which operations and production are suspended in the interest of conservation. The Secretary's decision in *Texaco, Inc.,* which

involved a similar lease, states that no distinction is to be made between those cases where the lease expressly provides for the possibility that operations might be curtailed or prohibited and those cases where the lease does not contain such a provision.

> [N]o valid reason suggests itself for distinguishing ... between leases which do and those which do not contain stipulations or provisions restricting or limiting operations and production under designated conditions.

*Id.* at 199. The source of the Secretary's authority to impose the drilling restrictions, then, is irrelevant for purposes of deciding whether a lease extension is required under § 209. All that matters is whether these restrictions, admittedly imposed in the interest of conservation, were sufficient under the statute to constitute a "suspension of operations and production." If they did, the lease must be extended. And *Texaco, Inc.* holds that withholding permission to drill is a § 209 "suspension of operations and production." [9] Thus, under the Secretary's own precedent, as well as under our independent evaluation of § 209, the controlling question is answered contrary to the district court decision and under the statute the lease is extended for a period of time equal to the total period of suspension, i. e., 12 months.[10]

**9.** *Texaco, Inc.* is consistent with past agency practice. In *Marathon Oil Co.,* 19 I.B.L.A. 1 (1975), the Interior Board of Land Appeals recounted that a 20-year oil and gas lease issued effective July 20, 1935 had

> limited the [lessees'] drilling rights to the drilling of wells which were "necessary to offset drainage from the leasehold through wells on adjoining lands unless and until authorized in writing by [the Secretary of Interior] to drill or produce additional wells." By letter dated October 23, 1941, the Acting Supervisor of the Casper Office, Geological Survey, informed [the lessees] that the drilling restrictions in the original lease would be terminated effective January 20, 1942. *Accordingly, pursuant to section 39 of the Act of February 9, 1933, 47 Stat. 798, 30 U.S.C. § 209 (1970), the original 20-year term of the lease was extended to January 20, 1962. Id.* at 2 (emphasis added). This indicates that the Secretary has interpreted drilling restrictions as a suspension of operations under the lease.

**10.** Although the concurrence mainly disagrees with our construction of the phrase "in the interest of conservation," it also denies that § 209 mandates a lease extension once a suspension in the interest of conservation has occurred. For this proposition the concurrence claims support from 30 C.F.R. § 221.21(b):

> § 221.21. *Well-spacing and well-casing program, well operations, required offsets, diligence, compensation in lieu of drilling.*
>
> \* \* \* \* \* \*
>
> (b) The lessee shall not begin to drill, redrill, repair, deepen, plug back, shoot, or plug and abandon any well, make water shut-off or formation test, alter the casing or liner, stimulate production by vacuum, acid, gas, air, water injection, or any other method, change the method of recovering production, or use any formation or well for gas storage or water disposal without first notifying the supervisor of his plan and intention and receiving written approval prior to commencing the contemplated work. *The approval by the supervisor of a drilling plan does not constitute a determination or opinion that the lessee will be entitled to an extension of his lease under any extension provisions of the public-land or acquired lands mineral leasing laws if he carries out his plan.* [Emphasis added.]

The italicized language was added to the regulation five years after the Department of Interior decided *Texaco, Inc., supra.* 31 Fed.Reg. 2614, 6415 (1966). Although the Secretary cites the regulation only as the proximate source of his authority to impose drilling restrictions, the concurrence contends "[t]he regulation precludes the § 209 automatic extension argument ...." Conc.Op. at 608 n.6. The argument apparently is that the 1966 amendment to § 221.21(b) modified the Department's recognition in *Texaco, Inc.* that a refusal to permit drilling amounted to a § 209 suspension requiring an appropriate extension of the lease.

In our view the italicized portion of § 221.-21(b) has no application to this case, making the absence of any reliance on it by the Secretary perfectly understandable. The caption of § 221.21, which remained the same after the 1966 amendment to subsection (b), indicates that its subject matter is the regulation of ongoing drilling operations, not the *suspension* thereof. The language of § 221.21(b) confirms this impression. It lists several drilling-related activities, none of which is to be undertaken unless specified in a "drilling plan" to be approved by the supervisor. There is no mention of the drilling *restrictions* at issue in *Texaco, Inc.* The regulation on its face thus serves to warn lessees not to rely on the mere approval of the lessee's "drilling plan" as entitling them to any lease extension under the "extension provisions" of the mineral leasing laws.

The concurrence presumes that "extension provisions" must refer to the lease extension

## C. Statute of Limitations

■ After ruling against Copper Valley on the merits, the district court indicated that Copper Valley's action was also time-barred because it

> never sought administrative review of this ["winter-season only"] restriction pursuant to the prescribed procedure in 30 C.F.R. § 290. Such a review procedure has been set up to lead to a final secretarial decision and trigger the ninety-day statutory judicial review procedure set forth in 30 U.S.C. § 226–2.

474 F.Supp. at 192. Copper Valley, however, was under no obligation to contest the restriction. It does not contest the authority of the Secretary to impose the drilling restriction and is not obligated to contest

provision of § 209, but we look for a more reasonable subject of the reference in light of § 221.21(b)'s total lack of concern with drilling *suspension*. One possible subject of the reference is 30 U.S.C. § 226(e), which provides that any lease on which "actual drilling operations were *commenced* prior to the end of its primary term and are being diligently prosecuted at that time *shall be extended* for two years . . . ." 30 U.S.C. § 226(e). This statutory provision *mandates* a lease extension whenever "actual drilling operations" are begun and are in process at the end of the primary term. Certainly the Department would want to inform lessees that mere approval of drilling operations would not constitute a "commencement" of such operations so as to require an extension of two years.

Supporting this interpretation is the language accompanying the promulgation of the 1966 amendment. The Secretary of the Interior stated:

> The purpose of the amendment is to *make it clear* that the approval by the Geological Survey of an oil and gas lessee's *plans to drill a well* does not constitute a determination or opinion that the lessee will *earn* an extension of his lease *if he carries out his plan*.

31 Fed.Reg. 6414–15 (1966) (emphasis added). This amendment was therefore apparently offered as one of clarification as opposed to one in which Department precedent was being overturned. The complete absence of comments, suggestions, or objections to the amendment further supports this view. The regulation would not seem to provide any authority for the Secretary to depart from the interpretations set forth in *Texaco, Inc.*, 68 I.D. 194 (1961).

That regulation 221.21(b) was not meant to have any effect on § 209 is further confirmed by a 1971 opinion of Interior's Solicitor's office.

restrictions it admits are legally authorized. As 30 U.S.C. § 209 recognizes, the Secretary had authority to impose such restrictions and the statute provided that in such event "the term of such lease *shall* be extended by adding any such suspension period thereto." *Id.* (emphasis added). Accordingly, since Copper Valley did not (and does not) contest the authority of the Secretary to impose such drilling restrictions, it was not in the position when the restriction was imposed of "contesting a decision of the Secretary involving an oil or gas lease." 30 U.S.C. § 226–2.[11] Thus, when the permit was granted with the restrictions, Copper Valley was not required to appeal and obtain an agency decision as to the ultimate consequences of the Secretary's action, if any, on the term of the lease. It could

The opinion analyzed the Outer Continental Shelf (OCS) Lands Act provisions governing suspensions of operations on oil and gas leases. The Solicitor concluded that the Act granted *by implication* an extension when the Secretary has directed a suspension of operations. Of more interest to the problem at hand are the observations made by the Solicitor in arriving at this conclusion. In examining the legislative history of the OCS Lands Act, the Solicitor noted

> H.R. 5134, the House version [of the OCS Lands Act] . . . incorporated nine sections of the Mineral Leasing Act. One of these sections was section 39 of the Mineral Leasing Act, [30 U.S.C. § 209] which gives the Secretary specific statutory authority to suspend operations and production on oil and gas leases in the interest of conservation and likewise *requires the extension of the term of leases which have been suspended*. There is no doubt that the House version of the bill as originally presented *would have required* the Secretary to extend leases on the Outer Continental Shelf which had been suspended in the interest of conservation.

78 I.D. 256, 262 (1971) (emphasis added). The mandatory, self-executing nature of extensions to be granted under 30 U.S.C. § 209 would therefore appear to be an Interior Department interpretation of long standing, unchanged by the promulgation of 30 C.F.R. § 221.21(b).

11. 30 U.S.C. § 226–2 provides: "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter."

assume that the agency would abide by the provisions of the Act and recognize that the suspension of operations extended the lease at the end of the term thereof. Copper Valley is now seeking review of the refusal to grant the automatic extension of the lease which is called for under the statute. It is not appealing the decision of the Secretary to impose the six months drilling restriction but merely seeks recognition of the extension of the lease that such suspension mandates under the statute.

 The Secretary diverges from the district court's opinion to suggest that Copper Valley's action is time-barred for another reason: Copper Valley should have sought review of the Oil and Gas Supervisor's letter of September 2, 1977, which informed Copper Valley "that the lease would expire on January 31, 1978, unless production in paying quantities was developed." App. Ex. R. Whatever may have been the merit of this position had the Secretary relied upon it below, he in fact did not. Instead, the Secretary decided Copper Valley's administrative request on the merits. Thus, assuming without deciding that the Supervisor's September 2 letter was a "final order or decision" that "adversely affected" Copper Valley, 30 C.F.R. § 290.2 (1979), the Secretary failed to treat it as such and cannot do so now. An agency that does not raise the issue in an administrative proceeding waives the applicability of a limitation period prescribed by its regulations. *Montship Lines, Ltd. v. FMC*, 295 F.2d 147, 151 (D.C.Cir.1961).

It remains only to note that the final secretarial decision occurred May 22, 1978, and that Copper Valley received notice of it in mid-July. The declaratory judgment ac-

tion of August 18 was within the allotted time.

#### D. Disposition of the Case

 In this case the Secretary, far from adequately explaining his departure from the precedent of *Texaco*, has completely ignored it. Affording different treatment to similar situations is the essence of arbitrary action. The Secretary also has arbitrarily ignored the language of § 209. Ordinarily this agency conduct would call for a remand for proper application of the appropriate legal standards, if the agency under the law could reasonably adhere to the result its challenged decision has reached. *See, e. g. Public Service Commission v. FPC*, 511 F.2d 338, 355 (D.C.Cir.1975). On the undisputed facts here, however, we conclude that no reasonable interpretation of § 209 can deny Copper Valley the extension it claims. Accordingly, the judgment of the district court granting summary judgment for the Secretary should be vacated and the district court in accordance with the foregoing opinion should grant the motion of Copper Valley for summary judgment in its favor.[12]

*Judgment accordingly.*

JOHN H. PRATT, District Judge, concurring in the remand:

I concur in the remand, but for reasons different than the majority's.

Congress intended the term "conservation" in § 209 to refer to the conservation of mineral resources, and not to more general environmental protection measures which may restrict production. The history of the 1933 statute shows that the concept of mineral conservation was advanced repeatedly

---

12. We cannot join the speculation that ordering a lease extension in this case will "create significant new land title difficulties in areas which have been subject to leasing, make new investment in oil exploration substantially more risky and expensive, and shortchange the United States as lessor, by conferring an unbargained-for windfall on the holders of existing leases." Conc.Op. at 609. The Secretary has not acquainted us with these asserted problems. If conditions in Alaska require a

special exception from § 209's plain meaning and policy then Congress is free to create one. In any event, were speculation within our province, we would venture that assuring oil and gas lessees, through lease extensions, the full exploration period that Congress has given them would *promote* new investment in oil exploration and benefit the United States. The United States is not shortchanged in the process; it is merely held to the lease terms specified in its statutory bargain.

by the bill's sponsors and managers, and was agreed to by opponents.[1] The Committee Reports on this and closely related suspension legislation reinforce this understanding.[2] This was also Congress's intention when it amended § 209 in 1946, an intent shown both by the statutory language and by the legislative history.[3] Where, as here, Congress incorporates words with a special meaning in the regulated field, and does so to overcome industry objections to the regulatory program, that congressional choice is entitled to special weight. *Corning Glass Works v. Brennan*, 417 U.S. 188, 201–02, 94 S.Ct. 2223, 2231, 47 L.Ed.2d 1 (1974). The majority reads "conservation" in its modern sense, and inadequately weighs the special meaning of the term "conservation" intended by Congress.

The Interior Department, which had authored and advocated the 1933 and 1946 statutes, interpreted § 209 to apply only to mineral conservation.[4] This example of contemporaneous construction by the responsible cabinet officer is strong evidence of the original meaning, especially where Congress reenacts the statute consistently with that construction. *E. g., United States v. Sheffield Board of Commissioners*, 435 U.S. 110, 131, 98 S.Ct. 965, 979, 55 L.Ed. 148 (1978). The Department acted consistently with this interpretation in subsequent administrative adjudication and rulemaking. The decision in *Texaco, Inc.,* 68 I.D. 194 (1961), relies strongly on this mineral conservation rationale.[5] Later rulemaking sharply restricted the grant of lease extensions based on drilling permit restrictions imposed for reasons other than mineral conservation.[6] That is precisely the sort of

---

1. 78 Cong.Rec. 15363–65 (1932) (remarks of Rep. Eaton, Floor Manager); 79 Cong.Rec. 704–05 (same); 79 Cong.Rec. 1881 (1933) (same); 79 Cong.Rec. 3385–86 (same). Opponents agreed. 78 Cong.Rec. 15364 (1932) (remarks of Rep. LaGuardia).

2. S.Rep.No.812, 72d Cong., 1st Sess. 3 (1932); H.R.Rep. No. 1737, 72d Cong., 1st Sess. 3 (1932). The same Congress enacted relief legislation allowing the Secretary to extend oil and gas prospecting permits where they had been suspended in the interests of conserving oil. Act of June 30, 1932, ch. 319, 47 Stat. 445–46 (1932). Under the Mineral Leasing Act as it stood then, Copper Valley would have held a permit and not a lease. Consequently, the Department's construction of this permit extension statute, a construction strongly emphasizing mineral conservation, is especially relevant here. Letter of Interior Secretary Wilbur to House Pub. Lands Comm., *reprinted in* H.R. Rep. No. 1145, 72d Cong., 1st Sess. 3 (1932), and in S.Rep.No.786, 72d Cong., 1st Sess. 3 (1932).

3. Congress continued to use "conservation" to refer to the conservation of mineral resources and their greatest ultimate recovery. The first sentence of § 209, added in 1946, authorizes lease adjustments "for the purpose of encouraging the greatest ultimate recovery." The last sentence, also added then, applies § 209 to unit development plans, plans authorized "for the purpose of more properly conserving the natural resources of any oil pool, field, or like area." Act of Aug. 8, 1946, ch. 916, § 5, 60 Stat. 952 (1946). Conservation is used in this sense elsewhere in the amendments: certain restrictions may be waived "whenever . . . the conserva-

tion of natural products may require it;" and subsurface storage is authorized "to avoid waste or promote conservation of natural resources." *Id.,* 60 Stat. 954 (1946).

The Interior Department, which had submitted the language of § 209 enacted by Congress, strongly agreed. *See Development of Oil and Gas on the Public Domain, Hearings Before the Sen. Comm. on Pub. Lands*, 79th Cong., 2d Sess. 232–33, 239 (Statement of Secretary Krug); *Id.,* at Appendix 18, 23 (Dept. report and substitute bill, including current version of § 209); *Development of Oil and Gas on the Public Domain, Hearings Before the House Comm. on Pub. Lands*, 79th Cong., 2d Sess. 9 (1946) (Statement of Secretary Krug).

4. *See* notes 2 and 3, *supra.*

5. Texaco was denied a permit because oil drilling would have resulted in the loss of more than a million tons of potash ore. *See* Texaco, Inc., 68 I.D. 196–97 (1961). The lease was extended (evidently after potash mining) because the permit denial conserved potash ore. *Id.* at 198–99. Potash is covered by the Mineral Leasing Act. 30 U.S.C. § 181, 281–85 (1976 ed.).

6. 30 C.F.R. § 221.21(b) (1979 ed.). The regulation precludes the § 209 automatic extension argument since the Secretary acted pursuant to his extension authority, including § 209, when he proposed and promulgated the regulation. *See* 31 Fed.Reg. 2614 (1966); 30 C.F.R. § 221 (1979 ed.) (history note). The Secretary failed to rely on that regulation in dealing with this case, however.

argument Copper Valley advances here, since it contends that the Department's imposition of winter-only drilling restrictions in the drilling permit operated automatically to extend the lease by the same amount of time drilling was forbidden. The Department's adherence to the mineral conservation rationale is entitled to respect.[7] *E. g., California v. United States*, 438 U.S. 645, 675–76 n. 30, 98 S.Ct. 2985, 3001 n. 30, 57 L.Ed.2d 1018 (1978).

I think a remand appropriate however, for the Secretary and his subordinates relied on legally irrelevant grounds to deny the extension.[8] The District Court should return the case to the Secretary and require him to decide explicitly whether winter-only drilling restrictions are "suspensions" under § 209, and to state the policy and legal reasons for his choice among plausible interpretations of § 209.

There are sound practical and legal reasons for this approach. We know little more about Alaskan drilling than the fact that it is expensive and difficult. By pronouncing a rule at sharp variance with present practice in Alaska, we may create significant new land title difficulties in areas which have been subject to leasing, make new investment in oil exploration substantially more risky and expensive, and shortchange the United States as lessor, by conferring an unbargained-for windfall on the holders of existing leases. These are cogent reasons for seeking a careful exercise of the Secretary's expert judgment before deciding the interpretive issue presented here. *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *McLaren v. Fleischer*, 256 U.S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921). By pronouncing a flat rule before the Secretary has acted, we may significantly impede Alaskan oil development vital to meeting the Nation's current and future energy needs. I doubt Congress intended that result.

---

7. The majority's reliance on *Gulf Oil v. Morton*, 493 F.2d 141 (9th Cir. 1974), is misplaced. That decision allowed suspensions under § 5(a)(1) of the Outer Continental Shelf (OCS) Lands Act, 43 U.S.C. § 1334(a)(1) (1976 ed.), to prevent oil well blowouts in the Santa Barbara channel. That interpretation of the OCS Lands Act is neither controlling nor persuasive on the Mineral Leasing Act extension question here. The language of § 5(a)(1) differs greatly from § 209 of the Mineral Leasing Act. Moreover, the court found that the Submerged Lands Act's broad statutory definition of conservation, 43 U.S.C. § 1301(e) (1976 ed.), was incorporated into the OCS Lands Act. *Gulf Oil v. Morton, supra*, at 145. That definition includes plant and fish life, as well as mineral conservation. *Id.* The Mineral Leasing Act incorporates no such definition. Finally, the legislative history shows that Congress intended "conservation" to be interpreted far more broadly in the OCS Lands Act than it was in the Mineral

Leasing Act. Suspension of Operations on Oil and Gas Leases, 78 I.D. 256, 258–60 (1971) (Opinion of Interior Dept. Solicitor). Congress used "conservation" differently in § 209.

8. The Secretary's statute of limitations argument assumes that Copper Valley was not entitled to a mandatory extension under § 209, and so assumed his conclusion to the issue in dispute here. The Secretary's argument concerning his discretion to deny a permit to a dilatory driller ignores the mandatory language of the statute. Moreover, in 1935, when Congress abolished the system of prospecting permits and replaced it with noncompetitive leases, like the one involved here, it made previously discretionary extensions for holders of prospecting permits mandatory for the leaseholders. Mineral Leasing Act Amendments of 1935, § 17, 49 Stat. 677, ch. 599 (1935).