637 F.2d 764
 UNION PACIFIC RAILROAD COMPANY, Petitioner in No. 79-1840,
Utah Railway Company, Petitioner in No. 79-2059,
Nevada Power Company, Petitioner in No. 79-2218,
v.
The UNITED STATES of America and The Interstate Commerce
Commission, Respondents,
Union Pacific Railroad Company, Utah Railway Company, and
Nevada Power Company, Intervenors.
 Nos. 79-1840, 79-2059 and 79-2218.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Sept. 18, 1980.
Decided Jan. 8, 1981.
 
 R. Eden Martin, Washington, D. C. (John Will Ongman and David M. Levy, Washington, D. C., J. Thomas Greene and John A. Beckstead, Salt Lake City, Utah, John J. Mullins, Jr., Denver, Colo., Robert B. Batchelder, Omaha, Nebraska, Callister, Greene & Nebeker, Salt Lake City, Utah, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., and Sidley & Austin, Washington, D. C., with him on brief and of counsel), for Union Pac. Railroad Co. and Utah R. Co., petitioners.
 James W. Lawson, Washington, D. C. (Bernard J. Hasson, Jr., Washington, D. C., M. Gene Matteucci, Las Vegas, Nev., and Robert Lee Kessler, Denver, Colo., with him on brief), for Nevada Power Co., petitioner.
 James H. Laskey, Washington, D. C. (John J. Powers, III, Atty., Dept. of Justice and Sanford M. Litvack, Asst. Atty. Gen., Washington, D. C., with him on brief), for U. S., respondent.
 Kathleen M. Dollar, Deputy Associate Gen. Counsel, Washington, D. C. (Richard A. Allen, Gen. Counsel and Timm L. Abendroth, Atty., I. C. C., Washington, D. C., with her on brief), for I. C. C., respondent.
 Before McWILLIAMS and BARRETT, Circuit Judges, and TEMPLAR, District Judge.*
 McWILLIAMS, Circuit Judge.
 
 
 1
 Each of these three petitions seeks review of an order of the Interstate Commerce Commission setting the rate which Union Pacific Railroad Company and Utah Railway Company may charge Nevada Power Company for transporting bituminous coal from Hiawatha, Utah to Moapa, Nevada. Jurisdiction is based on 28 U.S.C. § 2321(a) and § 2342, as amended. Nevada Power maintains a coal- burning station at Moapa, Nevada and purchases coal at two mines located near Hiawatha, Utah. Utah Railway transports the coal purchased by Nevada Power to Provo, Utah. Union Pacific thereafter transports the coal from Provo, Utah, to Moapa, Nevada.
 
 
 2
 On August 29, 1978, Union Pacific and Utah Railway, acting pursuant to 49 U.S.C. § 10702, filed with the Commission schedules which proposed a rate of $9.21 per ton for the movement of Nevada Power's coal from Hiawatha, Utah to Moapa, Nevada, subject to a minimum annual volume requirement of 350,000 tons. The railroads simultaneously filed a "fall-back" rate of $10.41 per ton for annual volumes between 150,000 and 350,000 tons. Nevada Power filed a protest in which it asked the Commission to suspend and investigate these rates. In a decision dated September 29, 1978, the Commission ordered an investigation into the rates but declined to suspend them during the investigation. Thus, the rates proposed by the railroads went into effect on October 1, 1978.
 
 
 3
 On October 10, 1978, the Commission ordered that the investigation of the proposed rates would be conducted under a modified procedure whereby evidence from all parties would be presented in written form. On July 31, 1979, the Commission entered its decision which cancelled the $9.21 per ton rate proposed by the railroads and declared that a rate not exceeding $7.91 per ton was justified by the record. By that same decision the Commission ordered the railroads to refund to Nevada Power that part of the increased rate found to be unjustified, with interest.
 
 
 4
 Union Pacific and Utah Railway filed separate petitions for review in this Court (Nos. 79-1840 and 79-2059, respectively). These petitions allege that the rate allowed by the Commission is too low. Nevada Power also filed a petition for review (No. 79-2218), claiming that the rate of $7.91 per ton is not cost justified. The Interstate Commerce Commission, one respondent, asserts that the rate is adequately supported by the record. The other respondent, the United States of America, asserts that the rate fixed by the Commission finds no rational support in the record, and asks that the matter be remanded to the Commission for further consideration. Nevada Power has intervened in the petitions for review filed by the two railroads, and the latter have intervened in the proceeding brought by Nevada Power. The three petitions were consolidated for briefing and oral argument.
 
 
 5
 Certain procedural problems should be addressed first. The railroads argue that the Commission's order is, in effect, a nullity because it acted in improper fashion in three particulars: (1) a quorum of the Commission did not participate in the decision; (2) a majority of those members of the Commission who did participate did not support the decision; and (3) the decision itself was not timely filed and served on the parties. In our view, these contentions have no merit.
 
 
 6
 49 U.S.C. § 10306(a) provides that a majority of the Commission is a quorum for the transaction of business. 49 U.S.C. § 10301(b) provides that the Commission is composed of eleven members. From these two statutes the railroads argue that a Commission quorum consists of at least six members. Only four members of the Commission participated in the decision here under review, and it is on this basis that the railroads argue that the Commission was irregularly constituted. We do not agree with this argument.
 
 
 7
 At the time the decision here under review was filed there were only six persons actually serving on the Commission, there being some five vacancies at that particular moment. 49 U.S.C. § 10301(e) provides that a vacancy in the membership of the Commission does not impair the right of the remaining members to exercise all the powers of the Commission. The Commission, the United States, and Nevada Power all argue that four members of the Commission constitute a majority of the six persons on the Commission as of the date that the decision was filed, and, therefore, a valid quorum of the Commission participated in the decision. We agree. We note that this particular argument was recently considered, and rejected, by the Seventh Circuit in Assure Competitive Transp., Inc. v. United States, 629 F.2d 467 (7th Cir. 1980). We are in accord with the Seventh Circuit's position on this issue.
 
 
 8
 The railroads also contend that the decision was not supported by a majority of the four commissioners who did participate. One of the four participating members definitely did not vote in support of the decision. Commissioner Gresham dissented. The remaining three, however, did vote for the decision. The confusion arises from the fact that in the so-called "notation votes" the three who in our view ultimately voted for the decision were not in accord as to the exact rate to be allowed the railroads. Commissioner Clapp voted for a rate of $7.91 which is equal to 107% of the fully allocated costs of Union Pacific, and 100% of the fully allocated costs of Utah Railway. Commissioners Stafford and O'Neal voted, by their notation votes, for a different figure. Subsequent to these preliminary notation votes, however, a revised proposal was circulated to the Commission members on an "absent objection" basis. No objections were voiced by Commissioners Clapp, Stafford or O'Neal. The Secretary was advised of such fact and directed to issue the decision. The railroad's claim that the decision was not concurred in by three members of the Commission is without merit.
 
 
 9
 Under 49 U.S.C. § 10707(b)(1) the Commission was required to complete its proceeding by April 30, 1979. All of the parties agree that this deadline was lawfully extended to July 31, 1979. The decision itself bears the date of July 31, 1979. The railroads argue, however, that since they were not actually served with a copy of the decision until sometime subsequent to July 31, 1979, the Commission's final decision was not timely filed as required by 49 U.S.C. § 10707. In support of their argument, the railroads cite 49 U.S.C. § 10327(i) as determinative of the definition of "final decision" for the purposes of 49 U.S.C. § 10707. The railroads' reliance on 49 U.S.C. § 10327(i) is misplaced. That statute pertains to when an action of the Commission is to be deemed final for the purpose of judicial review. In our view, the decision was entered on July 31, 1979, the last day that it could be lawfully entered under 49 U.S.C. § 10707.
 
 
 10
 Proceeding to the merits of the controversy, only the Commission urges us to affirm its decision. Union Pacific and Utah Railway ask us to set aside the decision. Specifically, Union Pacific and Utah Railway attack the manner in which the Commission computed their respective fully allocated costs,[1] and both attack the Commission's order restricting Utah Railway to a rate equal to its fully allocated costs, and limiting Union Pacific to only a 7% additive to its fully allocated costs.[2] Union Pacific claims that the so-called 7% "interim standard"[3] was adopted by the Commission after the present hearing had been closed, and that it was never given the opportunity to present evidentiary matter which would have demonstrated a need for an additive greater than 7%.[4]
 
 
 11
 Nevada Power also asks us to set aside the decision. Specifically, Nevada Power complains that the Commission offered no rational explanation in its decision as to why Union Pacific was entitled to any additive over fully allocated costs. Nevada Power further asserts that the Commission erred in accepting and relying on certain statements made by Union Pacific in its reply statement to the Commission regarding average lading weights,[5] which statements varied from earlier statements made by Union Pacific in its initial statement to the Commission, without giving Nevada Power at least an opportunity to respond thereto.
 
 
 12
 The United States challenges only the grant of a 7% additive to Union Pacific. According to the Department of Justice, the Commission's 7% solution is not adequately explained or justified by the Commission in its decision. The United States seeks a remand of this matter "for reconsideration in order that the agency may adequately explain its reasons for whatever maximum reasonable rate it concludes is appropriate."
 
 
 13
 Our study of the decision here under review leads us to conclude that the decision should be set aside and the matter remanded to the Commission for further proceedings. The parties should be allowed reasonable time to introduce additional statements, and the Commission should then render a decision which will more fully explain and justify the action taken, whatever it may be.
 
 
 14
 Our disposition of the present controversy is in general accord with the recent action of the Circuit Court for the District of Columbia in San Antonio, Tex. v. United States, 631 F.2d 831 (D.C.Cir.1980). That case was also a railroad rate case regarding rates to be charged for the movement of coal. At issue there were, inter alia, the manner in which the Commission determined fully allocated costs, as well as the same 7% additive. The Commission's order in the San Antonio case was no more detailed or specific than the order here under consideration. In the San Antonio case the Circuit Court set aside the decision of the Commission and remanded the case to the Commissioner for further proceedings. The Court there found the Commission's imposition of a 7% additive above fully allocated costs to have no basis in the record and to be wholly without supporting rationale or justification.
 
 
 15
 The particular facts of San Antonio are of course not identical to the facts of the present case, but the issue pertaining to the 7% differential price additive is, in our view, sufficiently similar to suggest that the parties to the present proceeding should be afforded the same opportunity as has now been given the parties to the San Antonio proceeding. The Commission's decision in the present case is equally devoid of support for the imposition of either the 107% or the 100% rate limitation. Additionally, we question the "interim" nature of the 7% figure and find the imposition of such a fixed standard in several recent ICC decisions anomalous in light of the oft-stated need for flexibility in rate-making decisions. Atchison, T. & S.F.R. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973). We are aware that a reviewing court must accord deference to a decision made by an administrative agency in the exercise of its expertise. Id. We must do so on the basis of the reasons articulated by the agency, however, rather than in an independent effort to justify its action. Harborlite Corp. v. I.C.C., 613 F.2d 1088 (D.C.Cir.1979). We are unable to do so in this case. We therefore must remand the entire matter to the Commission. In this regard, we find the cost determinations made by the ICC to be so inextricably intertwined with the determination of an appropriate differential price additive as to necessitate a remand of these issues as well.[6]
 
 
 16
 The decision of the Commission is set aside and the matter is hereby remanded for further proceedings.
 
 
 
 *
 Honorable George Templar, United States District Court, for the District of Kansas, sitting by designation
 
 
 [1]
 "The term 'fully allocated costs' is defined as 'that level of expenses which represents the sum of "variable costs" plus an appropriate allocation of fixed expenses, i. e., an allocation which assigns an adequate portion of fixed expenses to the movement of traffic on which the rate in issue applies.' " San Antonio, Tex. v. United States, 631 F.2d 831 (D.C.Cir.1980) (quoting Rules to Govern the Assembly and Presenting of Cost Evidence, 337 I.C.C. 298, 308 (1970))
 
 
 [2]
 Pursuant to the Railroad Revitalization and Reform Act of 1976 (4 R Act), the railroads may propose a rate which includes a price increment over and above fully allocated costs in order to assist them attain adequate revenue levels. This method of "differential pricing" has been judicially approved as a valid means of achieving the ultimate goal of the 4 R Act which is to financially regenerate the nation's railroads. Houston Lighting & Power Co. v. United States, 606 F.2d 1131 (D.C.Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). This does not mean, however, that the railroads are free to charge whatever the traffic will bear. Id. at 1148. Rather, the Commission must determine that these rates are reasonable and lawful. 49 U.S.C. § 10704. In its decision in the present case the Commission determined that "(s)ince the Utah Railway engages exclusively in the transportation of coal, its traffic is not subject to such pricing policies." Bituminous Coal, Hiawatha, Utah to Moapa, Nevada, 361 I.C.C. 923, 930 (1979). The Commission determined, however, that Union Pacific had "demonstrated a general system revenue need which justifies an increase of 7 percent to the fully allocated costs at a 10.6-percent cost of capital level." Id
 
 
 [3]
 The railroads argue that the 107% formula was first introduced as an interim standard by the ICC in Annual Volume Rates on Coal Wyoming to Flint Creek, Arkansas, 361 I.C.C. 533, 550 (1979). Subsequently, the Commission included the 7% formula in four other decisions excluding the present case: Increased Rates on Coal, Colstrip and Kuehn, MT to Minnesota, 362 I.C.C. 30 (1979); Unit Train Rates on Coal Burlington Northern, Inc., 361 I.C.C. 655 (1979); Arkansas Power & Light Co., 361 I.C.C. 504 (1979); San Antonio, Texas, 361 I.C.C. 482 (1979). The 7% standard has been classified as "interim" pending the formulation of more precise standards in Ex Parte No. 347, Western Coal Investigation Guidelines for Railroad Rate Structure (Notice of proposed rule-making served May 17, 1978)
 
 
 [4]
 The Commission enunciated the following evidentiary guidelines in Annual Volume Rates on Coal Wyoming to Flint Creek, Arkansas, 361 I.C.C. 553, 549 (1979): (1) specific identification of the traffic that must be subsidized by other traffic and the reason why rates cannot be increased on that traffic; (2) the extent to which the railroads provide service on unprofitable branch lines and the reason(s) why such service cannot be made profitable or abandoned; (3) identification of commodities other than coal which could also make substantial contributions to the railroad's system revenue needs; and (4) identification and quantification of excess capacity on a carrier's system
 
 
 [5]
 Nevada Power objects to the Commission's cost determination (prior to the 7% additive) which was based on an 84-car movement with an average lading weight of 91.3 tons. Nevada Power contends that the use of the 91.3 figure rather than the 100-ton figure which it proposed inflated the transportation costs from 52.2 cents to 69.6 cents
 
 
 [6]
 We are apprised of the ICC's ruling in Bituminous Coal, Hiawatha, Utah to Moapa, Nevada, I.C.C. Docket No. 37038 (July 14, 1980) in which the Commission revised its carload tonnage estimate from 91.3 to 95 tons and reduced the prescribed maximum reasonable rate by 20 cents, from $7.91 to $7.71, but affirmed its previous decision as to the 7% interim standard. This decision is the subject of two appeals now pending before this Court, Union Pacific Railroad Co., et al. v. United States, No. 80-1894; and Nevada Power Co. v. I.C.C., No. 80-2066. This Court has granted a motion to hold these proceedings in abeyance until a decision is rendered in the present case