GETTY OIL COMPANY, Plaintiff,

v.

William P. CLARK, Secretary, United States Department of the Interior, Defendant.

No. C84–0320–B.

United States District Court, D. Wyoming.

July 18, 1985.

Jerome C. Muys, Susan L. Smith, Holland & Hart, Washington, D.C., Marily S. Kite, Holland & Hart, Cheyenne, Wyo., for plaintiff.

Richard A. Stacy, U.S. Atty., D. Wyoming, Cheyenne, Wyo., Robert P. Schuster, Jackson, Wyo., Karin P. Sheldon, Sierra Club Legal Defense Fund, Inc., Denver, Colo., Steve Jones, Asst. Atty. Gen., Cheyenne, Wyo., Henry Phibbs, II, Jackson, Wyo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIMMER, District Judge.

This matter came on regularly for hearing before the Court on December 6, 1984 upon cross motions for summary judgment. Counsel appearing were Jerome C. Muys, Esq., Susan L. Smith, Esq., and Marilyn S. Kite, Esq., for plaintiff; Richard A. Stacy, Esq., United States Attorney for the District of Wyoming for defendant, and Karin P. Sheldon, Esq., Steve Jones, Esq., Robert P. Schuster, Esq., and Henry C. Phibbs II, Esq., for Intervenor Defendants. The Court has carefully reviewed the pleadings and the administrative record, considered

the arguments of counsel, and being fully advised in the premises, issues its Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

Plaintiff, Getty Oil Company, seeks judicial review of a decision of the Board of Land Appeals of the Department of Interior in *Sierra Club, et. al.*, (On Judicial Remand), 80 IBLA 251 (May 2, 1984), vacating the approval of Getty's Application for Permit to Drill (APD) an exploratory well on Lease No. W–20472, and remanding the application to the Wyoming State Office of the Bureau of Land Management for further action. Jurisdiction of the Court is invoked under 28 U.S.C. § 1331 and the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181, *et seq.* (MLA), the Federal Administrative Procedures Act, 5 U.S.C. §§ 701–706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and the Mandamus Act, 28 U.S.C. § 1361. Venue is properly in the United States District Court for the District of Wyoming under 28 U.S.C. § 1391(e).

Plaintiff, a Delaware corporation, is the unit operator of the Bear Thrust Unit located in the Bridger-Teton National Forest in northwestern Wyoming, and holds federal leases in that unit. Defendant, William P. Clark, was, at the time this action was filed, and at the time the relevant decision was entered by the IBLA, the Secretary of Interior for the United States and was responsible for administration of the federal oil and gas leases involved in this action pursuant to the provisions of the MLA cited above, and was sued in his official capacity only. Intervenor defendants were parties to the administrative proceedings out of which this controversy arose, and have standing to assert the claims presented herein.

Lease No. W–20472 is located in the Bridger-Teton National Forest, Sublette County, Wyoming, and was issued effective October 1, 1969 for a primary term of ten (10) years. The current lessee thereof is Northwest Exploration Company, holding it subject to rights accruing to plaintiff under an agreement between Northwest and Reserve Oil, Inc., plaintiff's predecessor in interest.

The beauty and environmental values of this area have long been recognized. Since August 15, 1947 this area has been subject to restrictions upon oil and gas drilling activities established in a 1947 memorandum of then Secretary of Interior Julius A. Krug, 47 F.R. 8091, (hereafter Krug Memorandum). Lease W–20472 covers property located south of the eleventh standard parallel which was not fully withdrawn from leasing activities, but any leases issued in that area were required to contain several conditions and environmental protection stipulations. The lease as originally issued does not contain stipulations authorizing the Secretary to deny totally any drilling activities upon the property. The lease was issued before the adoption of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et. seq.*, (NEPA).

The Krug Memorandum required unitization of leases within the relevant area in order to minimize the impact of oil and gas drilling activities upon surface resources in the area. Reserve Oil, Inc., on February 2, 1979, nine years and four months after the lease in question was issued and a mere eight months before the end of the primary term upon the lease, submitted an application for the formation of a unit, including Lease W–20472, to the United States Geological Survey (USGS) Conservation Division. The USGS Conservation Division subsequently was redesignated as the Minerals Management Service, and merged into the Bureau of Land Management. However, the agency was called the USGS during most of the events relevant to this proceeding, and has been referred to by the parties, and will be referred to by the Court, as USGS throughout to avoid confusion.

The USGS, pursuant to the requirements of the Krug Memorandum, forwarded Reserve's application to the United States Forest Service to obtain its concurrence and recommendations concerning additional stipulations to be added to the proposed

unit agreement. Four months later, on June 6, 1979, the Forest Service notified the USGS that it concurred in the formation of the unit as a logical unit, and specified additional stipulations to be added to the unit agreement in order to reduce adverse impacts upon the surface values. The terms of the unit agreement, which was issued in standard form pursuant to Department of Interior regulations, stated that Reserve as unit operator was given power to suspend all of the committed leases and to act on behalf of all lessees in proceedings concerning the unit before the Department of Interior.

On June 29, 1979 USGS designated the Bear Thrust Unit as a logical unit and approved the form of the unit agreement as modified to include the stipulations recommended by the Forest Service. Reserve proceeded to seek joinders from thirty-three (33) holders of working interests and overriding royalty interests in the twenty-five (25) leases comprising the Bear Thrust Unit. On September 17, 1979, less than fifteen (15) days before the expiration of the primary term of Lease No. W–20472, and nine (9) years and over eleven (11) months after such lease issued, Reserve submitted the Bear Thrust Unit Agreement with required joinders to the USGS for final approval. The agreement was approved by USGS on September 19, 1979, and Reserve was designated as the Unit Operator.

On August 14, 1979, a month before Reserve submitted the unit agreement with necessary joinders for final approval, Reserve requested permission from USGS and the Forest Service to stake a well on Lease No. W–20472. That same day the Forest Service notified USGS that it was concerned about the environmental impacts that staking could have, and requested that the application be denied until it had an opportunity to consult with its regional office. USGS then denied staking of the well on that basis. On October 2, 1979, Forest Service notified USGS that staking would be acceptable, and an order permitting staking was issued. Getty then undertook staking which was completed, and ap-

proved by an interdisciplinary team and representatives of USGS on November 6, 1979.

When USGS approved the unit agreement covering the Bear Thrust Unit on September 19, 1979, it requested Reserve to submit an abbreviated or "skeleton" APD. The application for a permit to drill was submitted and received by USGS on September 24, 1979, only a few days before the expiration of the primary term of Lease No. W–20472. However, it was determined that an extensive environmental review, including the preparation of an Environmental Impact Statement (EIS), would be necessary. It was apparent that a decision upon Reserve's APD could not be completed prior to the expiration of Lease No. W–20472, as well as many other leases committed to the Bear Thrust Unit.

Because of these impending time constraints, on September 21, 1979, less than ten (10) days prior to the expiration of Lease No. W–20472, Northwest submitted a request for suspension of that Lease as well as several other leases committed to the unit. It also sought from the Secretary an automatic suspension of other leases committed to the unit upon application when their lease terms approached termination. That request was consistent with the terms of the unit agreement and applicable regulations which provided that suspension orders relating to operations upon a single lease committed to the unit would be deemed applicable to obligations imposed upon the remaining leases committed to the Unit, and that operations, such as drilling upon one lease in the unit, would be attributed to the remaining leases, for purposes of extensions for two years beyond the primary terms of the leases pursuant to 30 U.S.C. § 226(e). Approval was recommended up through the chain of command in USGS, and the request was ultimately approved by the Director of USGS on May 7, 1980. Northwest and Getty, which had acquired Reserve and succeeded to its rights under the leases and Unit Agreement, were notified of the decision on May 30, 1980. The suspension was made retro-

active to September 1, 1979, over eight months before the time the decision was made, and twenty (20) days prior to the time the request for suspension was filed. The suspension order had the effect of extending Getty's lease term under Lease No. W–20472.

Two grounds were given for the decision granting the suspension: (1) delays imposed upon Reserve due to environmental concerns, such as delays resulting from the initial denial of the staking request, which had the effect of denying Getty "timely access" to the property; and (2) environmental concerns resulting from the fact that the property was being considered for possible inclusion in the National Wilderness Preservation System. Pursuant to the order of the Director of USGS, the suspension included the following provision:

Suspensions are for an indefinite period of time, subject to automatic termination on the first of the month in which (1) the Lessee and unit operator are notified in writing of the decision not to approve any oil and gas drilling operations within the Bear Thrust unit area on the basis of its determination that such operations would result in unacceptable impacts on wilderness characteristics of the area, or (2) actual approved drilling operations are commenced should it be decided to permit the drilling of the well.

The suspension defines various requirements for diligence in commencing and pursuing drilling operations within the unit "should drilling be permitted." The suspension order also provided that suspensions would be granted upon other leases committed to the unit upon application as they approached the end of their primary terms during the course of environmental study of the unit. Such suspensions were granted upon those leases without the need of detailed review by the Department, and all such suspensions were subject to the provisions quoted above.

Getty, in subsequent correspondence with the Department sought modification of the provision which stated that "should drilling be permitted and the unit operator or lessees do not commence actual drilling operations within 30 days following receipt of all necessary approvals and permits, the suspensions will terminate on the first of the month in which said thirty day period expires", because it provided inadequate time to spud the well and commence drilling operations upon the lease due to monitoring and other requirements imposed as a result of the environmental study. In response, the Department amended the terms of the suspension by stating that:

It is further understood that should drilling be permitted and the unit operator or lessees do not commence actual drilling operations within thirty days following completion of construction of the well site and access road in compliance with the approved application and Forest Service standards, the suspension will terminate on the first of the month in which said 30 day period expires.

The language of the original Bear Thrust unit suspension order was originally drafted for a suspension request on the Cache Creek unit, a separate unit adjacent to the Bear Thrust unit. It, too, lies within the area south of the eleventh standard parallel in the Bridger-Teton National Forest. The Cache Creek APD was filed just prior to the filing of the Bear Thrust APD by National Cooperative Refinery Association, and sought permission to drill an exploratory well within that unit. Because of common environmental concerns, a single EIS was prepared covering both APDs. While matters relating to the Cache Creek application are relevant to an accurate understanding of proceedings in relation to the adjacent Bear Thrust unit, prior to decisive action by the Federal agencies the Cache Creek APD was withdrawn.

A suspension was sought in relation to the Cache Creek unit prior to the time the suspension request was made for the Bear Thrust unit. On October 16, 1978 a memorandum was sent from the Acting Director of USGS to the Secretary of Interior, Cecil D. Andrus, through Assistant Secretary of Energy and Minerals Davenport and De-

partment of Interior Solicitor Krulitz. The memorandum recommended that the suspension be granted, subject to the condition that the suspension should terminate upon a determination that operations would result in unacceptable impacts on wilderness characteristics in the area, and that in such an eventuality, drilling operations would not be permitted, or, should drilling be permitted, then the suspension would terminate on the first of the month in which actual approved drilling operations are commenced. That memorandum was reviewed and approved by the Secretary of Interior, as well as the other officials mentioned above, and was included in the Cache Creek suspension order. Thereafter, the Director of USGS approved the Bear Thrust suspension request, but mandated that the language originated in the Cache Creek suspension order be included in the Bear Thrust suspension order as well. The USGS also included this term in several subsequent suspension orders covering "sensitive" areas upon which federal oil and gas leases had been issued.

After the suspension was granted, a complete APD was submitted by Getty. What may be one of the most detailed environmental reviews ever conducted was then commenced. During that environmental review opponents of Getty's application, including the intervenor defendants herein, argued the EIS must include review and consideration of the "no action alternative," namely, that of denying Getty access to the relevant lease for purposes of any drilling activities.

The Department questioned the propriety of this requested action, and referred the matter to Lowell Madsen, Department of Interior's Acting Regional Solicitor in Denver, Colorado, who issued a memorandum on October 10, 1980 stating that Getty's right to drill under the relevant leases, once issued, was "inviolable" and "basic", and could not be denied, although the Department could restrain and control operations upon the leases in order to protect the environment. Notably, the memorandum appears to have focused solely upon the conditions and stipulations contained in the

leases as originally issued in 1969, and did not address the impact, if any, of the provisions of the suspension order quoted above. The Forest Service referred the same question to its own counsel, Dean A. Gardner, who issued a memorandum on December 1, 1980, taking issue with the conclusion set forth in the Madsen memorandum. Nevertheless, USGS and the Forest Service, in reliance upon the result reached in the Madsen memorandum, rejected consideration of the "no action alternative" as unwarranted under the law and applicable lease provisions. The EIS was then completed, and the APD was approved by the USGS Area Oil and Gas Supervisor on May 18, 1982.

Intervenor defendants, Sierra Club, Jackson Hole Alliance, State of Wyoming, and Wyoming Wilderness Society, appealed that decision of the USGS Area Oil and Gas Supervisor to the USGS Director and the IBLA. The State of Wyoming and the Wyoming Wilderness Society also appealed the decision to approve road access to the drill site to the Chief of the United States Forest Service. The Sierra Club and the Jackson Hole Alliance later intervened in that appeal as well. On July 7, 1982, Acting Secretary of Interior Hodel wrote a letter to Ed Herschler, Governor of the State of Wyoming, expressing approval of the decision to grant Getty's APD. The IBLA construed this letter as a final dispositive decision of the Acting Secretary upon the issues presented in the various appeals depriving it of jurisdiction, and dismissed the appeals on July 20, 1982.

The intervenor defendants filed three separate actions in this Court seeking judicial review of the IBLA decision in October 1982, and the actions were consolidated in *Jackson Hole Alliance, et. al. v. Watt, et. al.,* Civil Action No. C82–409. Extensive proceedings were held by this Court in attempting to construct an administrative record for review of the administrative actions below. During the course of those proceedings it became apparent that the IBLA had misconstrued the Hodel letter and that Acting Secretary of Interior Hodel

had not intended to deprive IBLA of jurisdiction or to make a final, dispositive ruling upon the issues presented in the various appeals to the IBLA. Upon the motion of the Federal defendants, this Court remanded that proceeding to the IBLA on February 9, 1984.

After extensive proceedings on remand, and a careful review of the voluminous record constructed in preparation for the judicial review by this Court in C82–409, the IBLA on May 2, 1984 reversed the action of the USGS Area Oil and Gas Supervisor in approving Getty's APD, vacated the APD, and remanded the APD to the BLM for preparation of a supplemental EIS considering the "no action alternative" of denial of drilling activities within the Bear Thrust Unit. *Sierra Club, et. al.,* 80 IBLA 251 (May 2, 1984). The IBLA concluded that the original Lease No. W–20472 did not reserve a right in the Secretary of Interior to deny altogether the right to drill upon the lease, but that the language of the lease suspension orders, quoted above, empowered the Secretary to do so. As is stated in the IBLA decision and order:

> Where application is made for suspension of unitized oil and gas leases in order to preserve them from expiration pending approval of an application for permission to drill, and where the suspension is granted at the discretion of the authorized officer on condition that permission to drill may be denied upon a finding that drilling operations would result in unacceptable impacts on the wilderness characteristics of the area, and environmental impact statement on the effects of such drilling which fails to consider the alternative of refusing permission to drill is an inadequate basis for a decision to permit drilling.

*Id.* The IBLA further concluded that:

> The language [in the suspension letter quoted above] ... evinces a clear contemplation that the Department of Interior reserved the authority to decide not to approve any drilling operations based upon a finding of "unacceptable impacts on wilderness characteristics of the area."

The IBLA rejected Getty's contention that the Department lacked power to condition the suspension, either under the relevant system of statutory provisions and implementing regulations, or under the circumstances presented in this case, in light of the holding in *Copper Valley Machine Works, Inc. v. Andrus,* 653 F.2d 595 (D.C. Cir.1981). It concluded that all authority vested in the Secretary to deny or to condition a lease suspension, even though the condition might have the effect of precluding drilling upon the relevant leases, had been delegated to the Director of USGS by the Secretary and was properly exercised in this case. Finally, the IBLA concluded that the EIS failed to meet the requirements of Section 102 of NEPA since it failed to consider the "no action alternative", thus necessitating the preparation of a supplemental EIS.

Getty, and the Federal defendants in C82–409, sought reconsideration of the IBLA decision, but it was denied by IBLA on August 10, 1984. Getty then sought a stay of the decision ordering remand for preparation of a supplemental EIS pending judicial review of the IBLA decision, which was also denied. It then filed this action, seeking judicial review of a final administrative decision pursuant to 30 U.S.C. § 226–2 and 43 C.F.R. § 4.21(c).

### CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and the subject matter of this proceeding, and venue is properly in the United States District Court for the District of Wyoming.

This action seeks review, pursuant to 5 U.S.C. § 706, of an administrative decision. Under the Department of Interior regulations the IBLA is empowered to decide finally for the Department appeals to the head of the Department from decisions rendered by Departmental officials relating to the use and disposition of public lands and their resources. 43 C.F.R. § 4.2(3). The Secretary and the Director are permitted to

take jurisdiction of a case at any stage and to render a final decision in the matter, but where the Secretary or Director do not act the decision of the IBLA is binding upon the Department as fully and finally as if they had taken jurisdiction and themselves had decided the matter. 43 C.F.R. §§ 4.5, 4.1. Therefore, the decision of the IBLA constitutes the final agency action under review, and represents the official position of the Department of Interior upon the issues presented in this case.

■ The Court must give due deference to the expertise of the Department, and the decision of the IBLA should not be disturbed unless it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Gulf Oil Corporation v. Morton*, 493 F.2d 141 (9th Cir.1973); *Sierra Club v. Peterson*, 717 F.2d 1409–13 (D.C.Cir.1983); *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 681 (D.C.Cir.1982); *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992–02 (D.C.Cir.1979), *cert. denied sub nom; Committee for Auto Responsibility v. Freeman*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). In this case Getty challenges the exercise by the Secretary of discretionary power. The questions presented are (A) whether there was discretion or authority to condition the lease suspension; (B) whether the Secretary exercised that discretion; and (C) if so, whether such conduct was reasonable under the circumstances. *Rocky Mountain Oil and Gas Ass'n. v. Andrus*, 500 F.Supp. 1338 (D.Wyo.1980), *rev'd on other grounds sub nom ; Rocky Mountain Oil and Gas Ass'n. v. Watt*, 696 F.2d 734 (10th Cir. 1982).

■ Where an agency construes the statute under which it operates, and which it is required to enforce, and especially where the agency construes its own regulations, the Court must give due weight to the agency interpretation, and should not reject the agency's construction where it is one of two or more equally reasonable interpretations. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616

(1965); *Brennan v. Occupational Safety and Health Com'n.*, 513 F.2d 553 (10th Cir.1975); *Frontier Airlines, Inc. v. C.A.B.*, 621 F.2d 369 (10th Cir.1980). In determining whether the Secretary's conduct was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, the Court must review the whole record, or those parts of the record cited by the parties, giving deference to the rule of prejudicial error. 5 U.S.C. § 706. Under these standards the Court must presume the agency's action to be lawful. It will not substitute its judgment for that of the agency. Instead, the Court must affirm the agency's decision where it is supported by a rational basis, whether or not the Court may agree with its conclusion. *Union Pac. R. Co. v. United States*, 637 F.2d 764 (10th Cir.1981); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275 (D.C.Cir.1981); *Citizens Against Refinery's Effects, Inc. v. U.S. Env. Prot. Agency*, 643 F.2d 178 (4th Cir.1981).

■ Initially, the Court concludes that Getty's appeal is timely. Although the State of Wyoming alleges that Getty waived its right to challenge the authority of the Secretary, or the Director of USGS, to condition the grant of a suspension, it is obvious that Getty acted properly in asserting this appeal from the IBLA decision which in effect enforced that provision. An earlier challenge would not have been ripe, and it would not have permitted the agency to exercise its primary jurisdiction to construe the provisions of the suspension order. 30 U.S.C. § 226–2; 30 C.F.R. §§ 290.2 (1979); *Copper Valley Mach. Works, Inc. v. Andrus*, 653 F.2d 595, 606 (D.C.Cir.1981). Getty could not determine whether it would be "adversely affected" as a result of this provision until IBLA entered its decision remanding this matter for preparation of a supplemental EIS. Getty filed a timely appeal from that decision.

■ The Court also concludes that the issues presented in this case are ripe for judicial review. The decision of the IBLA constitutes final agency action, and the is-

sues are now fit for judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *In re Grand Jury, April, 1979*, 604 F.2d 69, 72 (10th Cir.1979); *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967); *Rocky Mountain Oil and Gas Ass'n v. Watt, supra*, 696 F.2d at 741 and note 9. The decision of the IBLA has an immediate and direct impact upon Getty in delaying the drilling upon the lease, and additional costs and expenses will be incurred as a result of the delay. Getty will suffer "hardship" as a result of such decision. *Norvell v. Sangre de Cristo Development Co., Inc.*, 519 F.2d 370, 376 (10th Cir.1975); *State of Utah v. Andrus*, 636 F.2d 276, 278 (10th Cir.1980), and business-related economic uncertainty constitutes sufficient "hardship" to give Getty standing to assert its challenge to the IBLA decision at this time. *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 72–73 n. 12, 101 S.Ct. 295, 301–02 n. 12, 66 L.Ed.2d 268 (1980). *Frozen Food Exp. v. United States*, 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956); *Abbott Laboratories v. Gardner, supra*, 387 U.S. at 152, 87 S.Ct. at 1517; *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 417–19, 62 S.Ct. 1194, 1200–01, 86 L.Ed. 1563 (1942); *Rocky Mountain Oil and Gas Ass'n. v. Watt, supra*, 696 F.2d at 741–742.

■ The IBLA conclusion that the Secretary of Interior had authority to condition the grant of Getty's suspension request so as to enable him to deny drilling operations, should it be determined that such operations would result in unacceptable impacts on wilderness characteristics of the area, was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. Getty correctly asserts, and defendants admit that the pre-FLMPA leases committed to the Bear Thrust Unit, including Lease No. W–20472, did not authorize the Secretary to prevent any activities upon the property that disturb its surface even in the face of significant environmental impacts, but rather only allowed the imposition of mitigating measures designed to minimize the impact. *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 and note 7 (D.C.Cir.1983). However, these "inviolable rights" may subsequently be altered or even lost through the expiration of the primary lease term, or through a denial or conditioning of a lease suspension requested by a unit operator or lessee.

■ Section 209 of Title 30, U.S.C., states, in part, as follows:

> "The Secretary of Interior, for purpose of encouraging the greatest ultimate recovery of ... oil, [and] gas ..., and in the interest of conservation of natural resources, is authorized to ... suspend ..."

operations under any Federal lease. The Secretary is not required to grant a suspension request whenever application is made, but rather is vested with discretion to deny such a request under appropriate circumstances.

Following the enactment of NEPA, the Secretary's authority under such provision was recognized to include power to grant, deny or mandate a suspension of operations in the interest of conserving the environmental values of the leased property. *Copper Valley Mach. Works, Inc. v. Andrus, supra*, 653 F.2d at 600–02 and note 8; *Gulf Oil Corporation v. Morton, supra*, 493 F.2d 141. The language of the statutory provision clearly vests the Secretary with discretion to grant or deny a requested suspension subject to the guidelines set forth in the provision. The overriding requirement is that he act in a manner which is reasonable under the circumstances. *Rocky Mountain Oil and Gas Ass'n. v. Watt, supra*, 696 F.2d at 745; *Blue Cross Ass'n. v. Harris*, 664 F.2d 806, 809 (10th Cir.1981), *citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976).

■ Because this statutory language does not specifically state that the Secretary may *condition* a suspension order, plaintiff argues that suspension is an all-or-nothing proposition, that the Secretary may

only grant or deny a request, and that any attempt to condition a suspension is beyond his statutory authority. This is a question of first impression.

30 U.S.C. § 189 provides:

> The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter,
> . . .

This provision grants the Secretary broad powers and authority commensurate with the broad responsibilities imposed upon his office. *Grindstone Butte Project v. Kleppe*, 638 F.2d 100–102 (9th Cir.1981); *Pan American World Airways v. U.S.*, 371 U.S. 296, 311–13, 83 S.Ct. 476, 485–86, 9 L.Ed.2d 325 (1963); *United States v. Wilbur*, 283 U.S. 414, 419, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931); *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); *Knight v. U.S. Land Association*, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 (1891); *Williams v. United States*, 138 U.S. 514, 11 S.Ct. 457, 34 L.Ed. 1026 (1891); *United States v. Midwest Oil Co.*, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). As stated by the Court of Appeals:

> The Court is not limited to the mere words of a statute, or what is expressly declared therein, and that which is incidentally necessary to a full exposition of the legislative intent should be upheld as being germane to the law. In the construction of a grant of powers, it is a general principle of law that where the end is required the appropriate means are given and every grant of power carries with it the use of necessary and lawful means for its effective execution. There is therefore conferred by necessary implication every power proper and necessary to the exercise of the powers and duties expressly given and imposed.

*Marrow v. Clayton*, 326 F.2d 36, 44 (10th Cir.1963).

Getty's construction of the Secretary's powers under 30 U.S.C. § 209 is unduly restrictive. It would effectively hinder the Secretary in performing the duties and obligations imposed upon him by Congress. Under the holding in *Copper Valley*, he may deny a suspension request when reasonably necessary to protect the environmental values of the leased property, or he may grant the request when he reasonably determines that environmental concerns are inadequate to override the lessee's interest in conducting drilling operations upon the property. To deny him the right to grant the suspension while conditioning it in a manner reasonably tailored to enable the effective protection of the environmental values pending further environmental study, would unjustifiably restrict him in attempting to administer the Federal leases placed under his jurisdiction. Section 209, by implication, authorizes the Secretary to condition the granting of a requested suspension in a manner reasonably tailored to protect the interests of conservation, including conservation of the environmental values of the leased premises.

Getty argues that, even if the Secretary could condition or deny a suspension under some circumstances, he could not do so under the circumstances presented here because of the holding in *Copper Valley, supra.* There the lessee applied for, and received, an APD which contained a stipulation designed to protect the tundra/permafrost surface values of the leased premises by permitting drilling operations during the winter season only, and denying access to the property for six months of the year, during the summer thaw. The lessee commenced drilling operations during the primary term of the lease, and diligently pursued them, receiving a two year extension provided by applicable regulations 43 C.F.R. § 3107.1 (1984). Subsequently, the lessee sought a further twelve-month extension upon the ground that it had been denied access to the property for a total of twelve months because of the surface stipulation. The Court held that the stipulation was, in substance, a lease suspension mandated by the Secretary to conserve the surface values of the premises, and concluded that the operator was entitled to an automatic extension for

the period of the suspension as a matter of right, since such an extension is mandated by 30 U.S.C. § 209 and 43 C.F.R. § 3103.4–2(b) (1984). *Copper Valley Mach. Works v. Andrus, supra,* 653 F.2d at 597–600. The issue presented in *Copper Valley* was "whether a restriction in a drilling permit prohibiting summer drilling in the interest of conservation worked a 'suspension of operations and production' that would extend the life of an oil and gas lease under Section 39 of the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 209." *Id.* at p. 597. The Court answered this question in the affirmative, stating:

> Where, by reason of positive directions of the Secretary of Interior, or by mutual assent of the Secretary and the lessee, production is prohibited from the leased area, the suspension period should not be counted as a part of the prescribed term.

*Id.,* at p. 603, quoting from H.R. Report No. 1737, 72nd Cong. 1st Sess. 2–3 (1932).

Getty urges that *Copper Valley* mandated the grant of its suspension request, removing any discretion the Secretary might otherwise have had, and that, since the Secretary lacked authority to deny the suspension under the circumstances, he also lacked authority to condition this suspension. In effect, Getty argues that since the Secretary delayed access to the property by denying staking when requested and by taking approximately four months to process the proposed unit agreement for the Bear Thrust unit, that delay constituted a de facto lease suspension mandating an extension of the lease term.

In *Copper Valley* the stipulation denying the lessee access to the property for a period of six months each year was a mandated lease suspension. The Court enforced the mandatory requirements of the MLA to extend any lease suspended by order of the Secretary for the period of such suspension. But, in this case the denial of staking, prematurely requested by Reserve, and the delay caused by the processing of the Bear Thrust unit agreement, did not constitute lease suspensions, defined by the lease itself.

■ Section 39 of the MLA makes a distinction between suspensions mandated by order of the Secretary and suspensions granted upon the request of the lessee or unit operator which was recognized by the Court in *Copper Valley.* As was stated by the Court:

> This is not a case where the Secretary was asked to revoke a retroactive suspension, but one where he was asked to recognize that a suspension was invoked by his action. Whatever relevance dilatory drilling may have when a lessee asks for a suspension, it is not a consideration where the suspension has already been directed by the Secretary.

*Copper Valley Mach. Works v. Andrus, supra,* 653 F.2d at 604. We believe that the Secretary has discretion to grant, deny or condition a suspension upon request by a lessee or operator, but should he grant or require a suspension, he must extend the lease term due to the mandatory language of 30 U.S.C. § 209.

■ Getty argues that, even assuming the Secretary had authority to condition or deny the requested suspension under the circumstances presented in this case, still such authority had not been delegated to the Director of the USGS, at least to the extent such condition would alter the basic rights and obligations of the parties under the leases in question; but, suffice it to say, any power which the Secretary had to condition leases, without reservation, was delegated to the Director of the USGS, prior to the time that the suspension order in question was entered. Therefore, the Director of USGS was authorized to condition the lease in the manner stated above. 45 F.R. 18,375 (3–21–80), codified at 43 C.F.R. § 3103.3–8(a) (1980).

■ The question remains of whether the delay resulting from the conduct of the USGS and Forest Service was such that any attempt by the Secretary to deny or condition the suspension requested by Getty would constitute an abuse of discretion. The determination by the IBLA that the Secretary, through the Director of USGS,

exercised his discretion to condition the lease suspension by reserving the right to deny any oil and gas drilling operations within the Bear Thrust unit because of a determination that such operations would result in unacceptable impacts on the wilderness characteristics of the area, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Getty relies upon affidavits executed by two BLM officials in the proceeding before the IBLA, C.J. Curtis, and Gerald R. Daniels, stating that they did not intend nor construe the language contained in the lease suspension as empowering the Secretary to deny any drilling upon the Bear Thrust unit. Their affidavits state that such language was included because of an erroneous belief that the Secretary was already empowered to deny such activities under the terms of the leases in question. Getty urges the Court to give effect to the intentions of the parties by ignoring this language as being superfluous and mistakenly included in the suspension letter.

Our review must be upon the record as a whole. The Court may not give inordinate weight to these two affidavits to the exclusion of the inconsistent evidence included in the record. The IBLA decision considered and rejected the Getty argument, stating that the intentions of C.J. Curtis and Gerald R. Daniels were not relevant to the issue of the proper construction of the suspension language, and not adequate to override the clear, unambiguous language contained in the suspension. The IBLA found a large body of evidence in the record indicating the language means what it says, including tacit admissions by Getty itself that drilling operations could be prohibited upon the premises. C.J. Curtis was the signatory of the suspension letter, but the record reveals that the suspension language, adopted from the prior Cache Creek suspension order, was included at the direction of his superior officer, the Director of USGS. While Gerald R. Daniels played a role in drafting this language for use in the Cache Creek suspension, he was only one of many authors included in the process. The primary question is the intention of the Secretary himself who approved the Cache Creek suspension upon the condition that such language be included in the suspension letter, and the Director of USGS who similarly approved the Bear Thrust suspension.

There is nothing in the record to disprove that the Secretary of Interior, or the Director of USGS, did not intend an unambiguous result following the inclusion of the suspension language. It must be presumed that they knew that the leases did not authorize denial of access to the property, in the absence of evidence to the contrary. The showing that subordinate agency personnel interpreted the order differently from the interpretation ultimately adopted by the IBLA means only that there was some conflict within the agency concerning the meaning of the order. It is not adequate to establish that the agency itself adopted differing interpretations, or to hold that the agency is bound by such a differing interpretation. *F.T.C. v. Anderson,* 631 F.2d 741 (D.C.Cir.1979). Getty's understanding or interpretation then becomes largely irrelevant in construing the effect of the order in question. The IBLA, as the highest Department of Interior authority to pass on the issue, has determined that the suspension language means what it says, and effectively empowered the Secretary to deny any drilling operations upon the premises under the conditions stated. 43 C.F.R. §§ 4.1 and 4.2. Judge Seymour, speaking for the Tenth Circuit Court of Appeals in *KVK Partnership v. Hodel,* 759 F.2d 814 (10th Cir.1985), which involved Interior Department regulations relating to the issuance of oil and gas leases, observed:

"... we are mindful that '(t)he scope of review under the "arbitrary and capricious standard" is narrow and a court is not to substitute its judgment for that of the agency.' *Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance Co.* [463 U.S. 29], 103 S.Ct. 2856, 2866 [77 L.Ed.2d 443] (1985). We may not set aside agency action that is 'rational, based on con-

sideration of the relevant factors and within the scope of the authority delegated to the agency by the statute.' *Id.*" Since this decision under review was supported by the weight of the evidence in the record, and was rendered after a full and careful review of the record, it cannot be disturbed by this Court.

■ Finally, even if contract principles should govern the proper construction of the suspension language, the evidence in the record supports the conclusion that the parties intended the suspension to include a grant to the Secretary of power to deny any drilling operations upon the premises because of unacceptable impacts on wilderness characteristics of the area. Getty has not carried its burden of showing mutual mistake, or that the parties did not intend that result. *White v. Roughton,* 689 F.2d 118, 120 (7th Cir.1982), *cert. denied* 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123 (3d Cir.1969); *Cave Construction, Inc. v. United States,* 387 F.2d 760 (10th Cir.1967).

We must conclude that the decision by the Secretary of the Interior, through the Director of USGS, conditioned the lease suspension on denial of drilling operations if such operations would result in unacceptable impacts on the wilderness characteristics in the area. That decision was not arbitrary, capricious, or an abuse of discretion, nor was it not in accordance with the law.

■ Getty has attempted to distinguish this suspension order from the order issued in the Cache Creek unit proceedings upon the ground that this suspension order empowered the Secretary to deny drilling operations throughout the entire unit, while the Cache Creek order was limited to operations upon a single lease. The suspensions of the other leases are not before the Court. This review is limited to the suspension order relating to Lease No. W–20472. More importantly, however, Northwest sought an order broader than that issued for the Cache Creek suspension order; Northwest asked for an order that would authorize suspension of any lease committed to the Bear Thrust Unit upon application. This request was made pursuant to the provisions of the unit agreement and governing regulations, which pooled the leases and imputed each suspension to the remaining leases in the unit. Thus, broader language utilized in the Bear Thrust suspension order was in response to the lessee's request; and, it should not be utilized to invalidate the order. Since the Department has not yet determined that any drilling operations should be denied, the narrow issue presented is whether such an order would be impermissible, in the event it is issued, under the circumstances presented in this case as a matter of law.

■ NEPA requires an agency to evaluate the environmental effects of major federal actions at the point of commitment. *Sierra Club v. Peterson, supra,* 717 F.2d at 1414. Since the enactment of NEPA, the Secretary is required to manage lands under Wilderness Act review so as not to impair the suitability of such areas for preservation as wilderness. The Secretary must, to the fullest extent possible, interpret and administer the policies, regulations and public laws of the United States in accordance with the policies embodied in NEPA, if there is no direct conflict between such policies and the law applicable to the agency's operations, in this instance the MLA. 42 U.S.C. §§ 4331, 4332. *Rocky Mountain Oil and Gas Ass'n. v. Watt,* 696 F.2d at 739; *Natural Resources Defense Council v. Berklund,* 458 F.Supp. 925, 935 (D.D.C.1978), *aff'd* 609 F.2d 553, 558 (D.C. Cir.1979); *Delaware Water Emergency Group v. Hansler,* 536 F.Supp. 26 (E.D.Pa. 1981), *aff'd* 681 F.2d 805 (3d Cir.1982). Environmental concerns must be evaluated in conjunction with the determination of whether or not to grant a suspension of operations requested by an operator or lessee under a Federal lease. *Copper Valley Mach. Works, Inc. v. Andrus, supra; Gulf Oil Corporation v. Morton,* 493 F.2d at 144–45; *Calvert Cliffs' Coord. Com. v. United States A.E. Com'n.,* 449 F.2d 1109, 1112–13 (D.C.Cir.1971); *State of New*

Hampshire v. Atomic Energy Commission, 406 F.2d 170, 175 (1st Cir.1969); Zabel v. Tabb, 430 F.2d 199, 211 (5th Cir. 1970); Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C. Cir.1972); Grindstone Butte Project v. Kleppe, supra, 638 F.2d 100. The Secretary is not only permitted, but is required, to take environmental values into account in carrying out his regulatory functions, unless there is a clear and unavoidable statutory authority prohibiting the Secretary from complying with NEPA's mandate. Grindstone Butte Project v. Kleppe, supra, 638 F.2d at 103; Detroit Edison Co. v. U.S. Nuclear Reg. Com'n., 630 F.2d 450 (6th Cir.1980); Flint Ridge Dev. Co. v. Scenic Rivers Ass'n., 426 U.S. 776, 787–88, 96 S.Ct. 2430, 2437–38, 49 L.Ed.2d 205 (1976). Had the Secretary failed to weigh the environmental concerns in conjunction with Getty's application for lease suspension, he would have violated his duties under NEPA.

■ Getty contends that it, and its predecessor in interest, were denied timely access to the leased property by the conduct of the USGS and the Forest Service, and that any attempt by the Secretary to deny access under the suspension language would be an abuse of discretion as a matter of law. However, the lease in question was subject to the Krug Memorandum at the time it was issued. The requirements of unitization, environmental evaluation and approval were then clearly foreseeable. The possibility of delay was further increased early the next year by the enactment of NEPA which mandated an environmental analysis before activities could be commenced upon the premises. Getty urges that the extent of the delay was unusual and was not foreseeable; but, The Sierra Club has refuted Getty's statistical analysis, by showing that the length of this delay was not unusual for unit agreements within the areas covered by the Krug Memorandum. Even if the length of that delay was not normal, neither are the lands involved here of the usual type of lands subject to such leases. Any reasonable operator or lessee would naturally expect

that an APD would not be granted pro forma. Unusual delays would have to be anticipated for proposed operations upon lands embodying the unique pristine values contained in lands subject to the Krug Memorandum. It was surely no surprise to Getty, by the time it filed its application for approval of the proposed unit, to learn that it could not expect to proceed with drilling operations without the grant of a lease suspension or extension.

■ The language of the suspension order denying Getty timely access to the property does not compel a different result. Several suspension orders are contained in the record. The Department of Interior's practice evidently was to grant a suspension whenever environmental studies in any way delayed the lessee in commencing operations on the lease on the grounds that the lessee was denied timely access to the premises. Although the Secretary may have chosen to exercise his discretion to permit suspensions in most instances, this does not constitute a waiver of his power to deny a suspension request, or to condition a suspension order. The suspension order, under the circumstances presented in this case, cannot now reasonably be said to be an abuse of the Secretary's discretion to condition the suspension.

■ The purpose of an EIS is to insure that the agency has considered all possible courses of action in assessing the environmental consequences of each proposed action. 42 U.S.C. § 4332(2); Sierra Club v. Watt, supra 717 F.2d at 1414; Rocky Mountain Oil and Gas Ass'n. v. Watt, supra, 696 F.2d at 739; Natural Resources Defense Council v. Berklund, supra, 458 F.Supp. at 938, aff'd., supra, 609 F.2d at 558. The current EIS relating to Getty's APD failed to assess the "no action alternative." The IBLA's decision to remand the APD for preparation of a supplemental EIS on that alternative was clearly within its authority, was in accordance with law, and in fact is mandated by NEPA. Swain v. Brinegar, 517 F.2d 766, 780 (7th Cir.1975); Keith v. Volpe, 352

F.Supp. 1324 (C.D.Cal.1972), *affirmed* 506 F.2d 696 (9th Cir.1974), *cert. denied* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

The Court must add this caveat: This decision is limited to the record before the Court and the very unusual circumstances of this case. While it is conceivable that under some circumstances a delay imposed by the Secretary could be so severe that a denial of a request for lease suspension would constitute an abuse of discretion, this is not that case. Also, the Court expresses no opinion as to whether or not operations should in fact be denied because of environmental concerns. That decision was not made by the IBLA below, and must be made in the first instance by the Department of the Interior.

Finally, the record shows that in October, 1984, Congress passed the Wyoming Wilderness Act of 1983, by which the property in question was added to the Gros Ventre Wilderness Area. The legislative history of the Act recognizes that the leases in question were the subject of litigation in this Court and before the Department. Congress expressly stated that it was not the intent of Congress to express an opinion concerning the validity of these leases. 130 Cong.Rec. S13, 275, S13, 280 (daily ed. Oct. 3, 1984), H10, 899 (daily ed. Oct. 1, 1984). The Wilderness area was declared subject to "valid existing rights." *Id.* Intervenor defendants argue Getty's interests do not constitute "valid existing rights" and are voided by the enactment of the Wyoming Wilderness Act of 1983. They request the Court to declare such rights void. This Court may not consider contentions that were not presented in the administrative proceeding below. *Cisternas-Estay v. Immigration & Nat. Service,* 531 F.2d 155 (3rd Cir.), *cert. denied,* 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 127 (1976); *Dobbs v. Train,* 409 F.Supp. 432 (N.D.Ga.1975); *aff'd. sub nom Dobbs v. Costle,* 559 F.2d 946 (5th Cir.1977); *Getty Oil Co. v. Andrus,* 607 F.2d 253 (9th Cir. 1979); *American Elec. Contracting Corp. v. United States,* 579 F.2d 602, 217 Ct.Cl.

338 (1978). This is especially true where, as here, the proper construction of the term "valid existing rights" is far from clear under applicable precedent. *cf., Rocky Mountain Oil and Gas Ass'n. v. Watt, supra,* 696 F.2d at 739, 746 n. 27; *Natural Resources Defense Council v. Berklund, supra* 458 F.Supp. at 938 and note 21. The Department of the Interior must pass upon this issue in the first instance in conjunction with the remand in *Sierra Club, et. al.* (On Judicial Remand).

While the IBLA decision is somewhat ambiguous in this regard, the Court believes that three issues remain to be determined by the BLM on remand: First, the BLM must determine whether or not Getty has a valid existing right that was preserved under the Wyoming Wilderness Act of 1983; Second, if so, the BLM should prepare a supplemental EIS considering the "no action" alternative; and, Third, after such supplemental EIS is prepared, the BLM must determine whether or not oil and gas drilling operations would result in unacceptable impacts on wilderness characteristics of the area and whether Getty's APD should be granted.

Therefore, it is

ORDERED that the plaintiff's Motion for Summary Judgment be, and the same hereby, is denied; It is further

ORDERED that the Motions for Summary Judgment of the defendant and the intervening defendants be, and they hereby are, denied; It is further

ORDERED that the decision of the Board of Land Appeals of the Department of the Interior, vacating approval of Getty's Application for Permit to Drill an exploratory well on Lease No. W–20472 and remanding the application to the Wyoming State Office of the Bureau of Land Management for further action is affirmed and this matter is hereby so remanded.