**Alfred G. HOYL, Plaintiff,**

**v.**

**Bruce BABBITT, Secretary, Department of the Interior, Defendant.**

No. 93–B–988.

United States District Court, D. Colorado.

June 14, 1996.

James F. Engelking, Denver, CO, for Plaintiff.

Robert D. Clark, Assistant U.S. Attorney, Denver, CO, for Defendant.

MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Petitioner Alfred G. Hoyl (Hoyl) appeals the determination of the Interior Board of Land Appeals (IBLA) denying a suspension of operations under § 7(b) or § 39 of the Mineral Land Leasing Act of 1920 (MLA), 30 U.S.C. §§ 207(b), 209. I affirm the decision of the IBLA.

I. Summary of Facts.

In 1966, Gerald Tresner sought to obtain a federal coal lease under the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. § 181 et. seq., for land north of Fruita, Colorado. He filed and was granted a prospecting permit on October 1, 1966 which ripened upon discovery of coal into three preference right lease applications (PRLAs). Defendant's Exh. U. To be entitled to a coal lease, Tresner had to prove that the discovered coal was commercially viable.

Hoyl and Donald E. Wilde owned fee land next to Tresner's PRLAs which contained cameo and anchor coal outcrops. In 1976 Tresner entered into an operating agreement with Hoyl and Donald E. Wilde for development of these coal seams. Hoyl submitted a hypothetical mine plan for development of the PRLAs to the United States Geological Survey which was approved on June 23, 1977. Hoyl, Wilde and Tresner then contracted with Dorchester Coal Inc. (Dorchester) to develop the mine site on the fee land. Mining on the fee land was complete by 1979.

On July 18, 1980, pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 et.seq., the Bureau of Land Management (BLM) prepared an environmental assessment (EA) on Tresner's PRLAs and found that the mine plan was the preferred alternative. Tresner then assigned the three PRLAs to Dorchester. Each PRLA was issued as a separate lease containing one logical mining unit. The leases were issued in Dorchester's name on July 1, 1981.

The coal entries on the fee land were kept open after 1979 while leases for the federal land were sought. On June 21, 1983 a fire broke out in the entries. The United States Safety and Health Administration ordered the entries sealed and flooded. While the entries remained closed, Dorchester filed a resource recovery and protection plan (R2P2) under the new federal regulations. On October 6, 1983, Dorchester sent a letter to the BLM requesting a modification to the two interior boundaries between the three leases. Dorchester requested this modification after conducting drilling which indicated that each unit was sufficient to support a single independent operation through the use of long-wall technology. No request was made to suspend operations based on the fire. After the fire, BLM prepared a schedule for the preparation of an environmental impact statement (EIS) but later decided to forego it.

In late 1983 and early 1984, Dorchester submitted separate mine plans for each lease to the Office of Surface and Mining (OSM) and the Mined Land Reclamation Division (MLRD). All of the applications were seriously deficient because of inadequate baseline data. OSM promptly notified Dorchester of these deficiencies which were never corrected. From 1985 through 1988 the OSM and MLRD did not act on the applications due to insufficient information.

In 1986 Dorchester was sold and the federal leases were eventually owned by American Shield Development Company (American Shield). In 1988, American Shield withdrew the R2P2 stating: "After careful evaluation of the plans outlined in the pending permit applications for the above referenced leases we have determined that the development of the coal resources as proposed is not feasible under the current market conditions." Defendant's Ex. E. In 1988, the BLM notified American Shield that it was in default on its bonding requirements and failure to cure the default would result in a loss of the federal leases.

To protect his interest in the leases, Hoyl met with BLM personnel on February 23, 1989 to discuss his options. After this meeting, Hoyl bought Wilde's and Tresner's interests in the federal leases. On April 3, 1989 he requested a transfer to him of record title interest in the federal leases from American Shield. He then requested a suspension of operations and production under section 39 and section 7(b) of the Mineral Leasing Act, 30 U.S.C. § 209, 207(b), on April 6, 1989.

Hoyl met with BLM personnel again on June 26, 1989 to discuss the status of his suspension application. He then provided a $50,000 cash bond for the transfer of record title to the leases and a surety bond for annual rental payments. The bonds were not secured until December 14, 1989 when Hoyl purchased three U.S. Treasury Notes and cash bonds which were filed December 20, 1989. Decision, January 11, 1990, P's Ex. 12. The federal leases were transferred to Hoyl and Wilde jointly on January 1, 1990. On January 22, 1990, the BLM issued a memorandum stating that the application for suspension could now be processed as Hoyl was the record title holder.

On August 21, 1990 BLM issued its decision denying the application for suspension. The § 39 suspension application requested a five year suspension during which Hoyl could complete due diligence work. Hoyl also requested a force majeure suspension under § 7(b). In the absence of suspension, the due diligence period would expire on July 1, 1991. In the suspension application, Hoyl stated that "We expect to commence permitting without delay and will keep you advised as to our progress." Thus, in his application, Hoyl admitted that a permit to mine under SMCRA had not been obtained.

The BLM issued its opinion denying suspension on August 21, 1990. The decision was rendered after Hoyl presented additional data on June 18, 1990 which included a mine development schedule. The BLM determined that the mine development schedule shows that production will not be achieved until the fourth year of the production plan. Because suspension denies all beneficial use of the lease including access to conduct mining to achieve due diligence there would only be eighteen months remaining at the end of the suspension to achieve production. By Hoyl's own representations, a suspension would not permit him to achieve diligent development in eighteen months.

The BLM also determined that Hoyl was not entitled to suspension because he did not meet its prerequisites. To qualify for a suspension, an operator must have authorization to mine and have begun onsite development. The BLM found that American Shield formally withdrew permitting applications in 1988. The MLRD confirmed that Hoyl had not submitted a permit. Moreover, Hoyl states in his application that "we expect to commence permitting without delay," acknowledging that the requisite permits had not been acquired. The BLM concluded that the mine portals on the fee lands sealed after the fire were only one of several alternatives for maximizing extraction of coal. No federal coal would be lost in the absence of suspension.

Addressing force majeure, the BLM determined that the 1983 fire did not constitute an "unexpected or uncontrollable event that may excuse a party from contractual obligations." The 1983 fire did not interrupt operations as no operations had commenced on the federal leases. Furthermore, any claim that the fire interrupted operations on the fee land was not founded because mining had ceased four years before the fire. Finally, the permit application submitted by Dorchester in 1983 indicated that the spontaneous combustion problem was controllable and would not restrict development. BLM, thus, denied suspension for force majeure. Hoyl appealed.

On appeal, the IBLA affirmed the BLM's denial of suspension by decision dated June 3, 1992. Hoyl's petition for reconsideration was granted. On reconsideration, the IBLA considered new arguments raised by counsel for Hoyl as he had proceeded pro se in the hearing before the BLM and the appeal in front of the IBLA.

On reconsideration Hoyl argued that the denial of suspension under § 39 was inconsistent with the BLM's grant of suspension to Trapper Mining, Inc. where the BLM found that the suspension would prevent a loss of mineral resources. The IBLA found that the facts concerning the Trapper lease were distinct from the facts of Hoyl's lease. Significantly, no operation had ever occurred on Hoyl's federal leases and representations made by Hoyl's predecessor in interest, Dorchester, indicated that each lease could be developed as a separate mining unit.

Hoyl next argued that administrative delays had denied him beneficial use of his federal leases. IBLA rejected these arguments finding that any delay was not prejudicial to Hoyl because he was not the owner of the federal leases at the time. Moreover, any administrative delay was negated by the fact that the applications, which arguably may have been subject to delay, were withdrawn. Thus, the failure to develop the federal leases was the result of the lessee's choices and not government delay.

Hoyl's final argument was that the government should be estopped from denying the suspension application because he relied on representations made by BLM personnel regarding his suspension application. In the absence of these representations, Hoyl asserted that he would not have made significant investments to rehabilitate the leases. The IBLA found that at most Hoyl established that BLM officials had expressed optimism regarding his application but had not actively misinformed him. Because there was no active misconduct, estoppel was not warranted. The IBLA reaffirmed the June 3, 1992 decision on February 9, 1993. On April 5, 1993 IBLA issued a decision terminating the lease.

Hoyl filed this action on May 7, 1993. Hoyl asserts seven claims of error: (1) failure of the BLM to follow the law and its own regulation when processing his suspension applications; (2) unreasonable administrative delay; (3) failure to consider the impact upon natural resources when determining whether to approve the suspension application; (4) failure to hold that the 1983 fire constituted force majeure for purposes of § 7(b); (5) failure to comply with the National Environmental Policy Act (NEPA); (6) breach of fair dealing; and (7) estoppel. Hoyl did not raise the issues of failure to comply with NEPA or breach of the covenant of fair dealing in the administrative process.

## II.

The parties cross-motions for summary judgment mischaracterize this action. Hoyl's claims arise solely from the determination of the BLM as affirmed by the IBLA. This action constitutes judicial review of an

agency determination under the Administrative Procedure Act (APA). 5 U.S.C. § 701 et. seq. The scope of review of agency action is set forth in § 706 which provides: "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—(2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." "The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994).

## III.

### A. Denial of a force majeure suspension under section 7(b).

■ Hoyl argues that the BLM acted arbitrarily and capriciously when it failed to find that the 1983 fire qualified as a *force majeure,* entitling him to a suspension under § 7(b). 30 U.S.C. § 207(b). I disagree. Pursuant to § 7(b), an operator may be entitled to relief from the conditions of diligent development "where operations under the lease are interrupted by strikes, the elements, or casualties not attributable to the lessee." 30 U.S.C. § 207(b). Where such suspension is granted, it is conditioned upon the payment of advance royalties. Id. Moreover, a grant of suspension of operations under § 7(b) does not relieve the operator of the due diligence requirement. Id.

The fire occurred on fee simple land adjacent to the federal leases which does not constitute a *force majeure* where the properties are not part of a logical mining unit. In 1983, after the fire, Dorchester made no representation that the fire impeded the development of the federal leases and, in fact, contrary to Hoyl's assertions, affirmatively stated that each lease would be developed separately. Thus, a fire on the fee land could not impede operation on the federal leases because development would not occur

through fee land entries. Nor did the fire impede operations on the fee land because operations there ceased in any event in 1979. In addition, the fire was determined not to constitute a force majeure because Dorchester knew about the problem as early as 1978. Consequently, the event was not unforeseeable.

The IBLA also determined that Hoyl was not entitled to relief under § 7(b) because he had not commenced operations and, therefore, had not achieved "diligent development" or "continued operation." Therefore, under the language of § 7(b), there was nothing to suspend and no relief was available. *Mountain States Resources Corp.*, 92 IBLA 184, 193 (1986); 43 C.F.R. § 3483.1(a)(2). The IBLA's determination of the facts and interpretation of the law was well founded. Consequently, I affirm the IBLA's denial of a § 7(b) suspension.

### B. Denial of suspension under section 39.

Hoyl argues that the BLM acted arbitrarily and capriciously when it failed to grant his application for suspension under section 39. 30 U.S.C. §§ 209. Hoyl asserts that the suspension was in the "interest of conservation" and would provide for the greatest recovery of coal. I disagree.

Generally, a coal lease is granted "for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities from that lease." 30 U.S.C. § 207. However, "Any lease not producing in ten years shall be terminated." Id. This ten year period was adopted by the 1976 Federal Coal Leasing Amendments Act, Pub.L. No. 94–377, and is referred to as the "due diligence period." The purpose of the 1976 Amendments was to encourage diligent development of coal leases. The due diligence period commences at the time the lease is granted regardless of whether the operator has the proper operating permits.

In Colorado, an operator granted a coal lease by the BLM cannot mine the property until he obtains a permit from both the OSM and the MLRD. This permit ensures that the requirements of the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201–1328, are met. To qualify

for a permit, the operator must submit a detailed mine plan which states how the mine will be operated and ensures compliance with SMCRA.

■■■ An operator can be relieved from the requirements of due diligence under § 39 of the MLA which provides:

> The Secretary of Interior, for the purpose of encouraging the greatest ultimate recovery of coal ... and in the interest of conservation of natural resources, is authorized to waive, suspend or reduce the rental ... whenever in his judgment it is necessary to do so in order to promote development, or whenever in his judgment the leases cannot be successfully operated under the terms provided therein. * * * In the event the Secretary of Interior, in the interest of conservation, shall direct or shall assent to the suspension of operations and production under any lease granted under the terms of this chapter, any payment of acreage rental or of minimum royalty prescribed by such lease likewise shall be suspended during such period of suspension of operations and production; and the term of such lease shall be extended by adding any such suspension period thereto.

A suspension can be granted at the request of a lessee or can be mandated by the Secretary in his discretion. *Getty Oil Co. v. Clark,* 614 F.Supp. 904, 915 (D.C.Wyo.1985). A suspension may be granted in the Secretary's discretion when it is necessary to avoid an environmental harm. *Copper Valley Mach. Works, Inc. v. Andrus,* 653 F.2d 595, 600 (D.C.Cir.1981). When a suspension is granted, it extends the ten-year due diligence period for the period of the suspension. *Suspensions of Operations & Production for Coal Leases under Section 39 of the Mineral Leasing Act,* 96 Int.Dec. 15, 30 (D.O.I.1988). However, during the period of suspension, the operator is denied "all beneficial use of the lease, including production." *Id.* at 20. Therefore, an operator cannot perform any operations on the property during a § 39 suspension.

■■■ Hoyl argues that the Secretary did not act reasonably when he denied a suspension of the due diligence period under § 39. He contends that a suspension would have maximized recovery and minimized waste.

Hoyl argues that the facts of his case are synonymous with those in Trapper Mining Inc.'s application for suspension which BLM granted. Plaintiff's Exh. 30. In contrast to the present facts, Trapper had an ongoing coal mining operation with an approved mine plan and an established market when it filed its suspension application. The requested suspension was for a federal lease which was part of a development plan that included progression across several federal leases as well as fee and state land. Trapper represented that because of its location and higher strip ratios it was not likely that the lease could be operated as a separate unit in the future. The BLM was persuaded that if it did not grant a suspension the coal might be bypassed. Although Trapper's leases had never been approved as one logical mining unit, the BLM treated it as such in order to maximize recovery and minimize waste.

Here, no production has occurred on the three federal leases and Hoyl has never obtained the proper permits to mine. The IBLA's determination that development of the federal leases was delayed due to poor economic conditions is supported by the representations made by American Shield when it withdrew its R2P2 application. By letter dated June 14, 1990, Hoyl represented to the BLM that he had a potential coal buyer, Sumitomo. However, no contract or other manifestation of the agreement was ever presented. Finally, the R2P2 submitted by Dorchester in 1983 treated each of the federal leases as a separate mining unit, thus, undermining Hoyl's arguments.

Hoyl next argues that his situation is similar to that of Consolidated Coal Company (Consolidated) which was granted a suspension in 1986. Plaintiff's Exh. 29. Consolidated owned the Meeker lease which was adjacent to the James Creek parcel on which Consolidated had a pending preferential right lease application. Based on environmental questions presented by the James Creek lease, the BLM decided to prepare an EIS on the James Creek parcel. This delayed processing the lease application. Consolidated applied for a suspension of the Meeker lease while the James Creek application was pending. Consolidated asserted

that it would be not be economically feasible to develop the two properties separately. The BLM suspended the Meeker lease even though no operations had occurred and no market for the coal had been established.

Hoyl's circumstances differ from those of Consolidated. Because Hoyl's federal leases were issued on the same date they could have been developed as a single mining unit regardless of whether they had been approved as a logical mining unit. Any administrative delay attributable to Hoyl's federal leases was negated when American Shield withdrew its R2P2 application. Finally, the IBLA's determination that Hoyl had not proven that the coal resources subject to the federal leases would be lost if not developed is supported by the record. Accordingly, the BLM's denial of the § 39 suspension is upheld by the IBLA was within its discretion.

■ Hoyl correctly asserts that a suspension may be granted as a matter of right where the lessee is denied beneficial enjoyment of the lease. *Getty Oil Co. v. Clark,* 614 F.Supp. 904, 921 (D.C.Wyo.1985). Hoyl argues that BLM's failure to act expeditiously on his suspension application denied him beneficial use of the leases, thus, entitling him to a suspension. Contrary to Hoyl's assertions, any delay in processing the suspension application was due to his failure to provide secured bonds necessary for title transfer of the federal leases to him. Within three weeks of receiving adequate bonds, the BLM processed his suspension application. No suspension of right is warranted.

Even if granted a suspension, by his own admission, Hoyl would not have achieved commercial operations within the due diligence period. The statute requires an operator to produce commercial quantities within ten years. The leases here were granted in July of 1981 so commercial production should have been achieved by July of 1991. Hoyl's predecessor's never commenced operation on the leases and the leases lapsed in 1989. Hoyl cured the default and requested a suspension of the due diligence period for five years under section 39. A section 39 suspension suspends the due diligence period but prevents the operator from beneficial use of the property including production. *Suspensions of Operations' & Production for Coal Leases Under Section 39 of the Mineral*

*Leasing Act,* 96 Int.Dec. 15, 20 (1988). Thus, during the five year suspension Hoyl could not conduct any activity on the property which would lead to production. Any production on the property would immediately terminate the suspension. *Id.* If the suspension had been granted on the day requested, April 6, 1989, Hoyl would have had two years and three months remaining after the suspension ceased to bring the property into production. On appeal of the denial of suspension, he submitted a mine plan which outlined development of the federal leases. In the plan Hoyl represented that production would not occur until the fourth year of development which exceeds the two years and three months allotted under the MLA. Thus, a suspension would not allow Hoyl to bring the coal leases into production within the extended due diligence period.

**C. Estoppel.**

■ Hoyl next asserts that the BLM should be estopped from denying suspension because he relied on statements made by BLM personnel acting within the scope of their authority. Again, I disagree. "It is far from clear that the Supreme Court would ever allow an estoppel defense against the government under any set of circumstances. However, even assuming estoppel could be applicable, the Court has indicated that there must be a showing of affirmative misconduct on the part of the government." *In re DePaolo,* 45 F.3d 373, 376–77 (10th Cir.1995). Here, at most, BLM officials expressed optimism regarding Hoyl's chances of obtaining a suspension. Such action does not constitute an affirmative act of misrepresentation or concealment of material fact. *Id.* Moreover, Hoyl's reliance on oral representations is inadequate to give rise to an estoppel claim. *See Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 64, 104 S.Ct. 2218, 2225–26, 81 L.Ed.2d 42 (1984). I conclude that the IBLA was not arbitrary or capricious when it denied Hoyl's estoppel claim.

**D. Procedural Due Process.**

■ Hoyl contends that the government violated his Fifth Amendment right to due

process by failing to provide him with a hearing. I disagree.

The due process clause provides that one shall not be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. Hoyl asserts that the government deprived him of a property right when it failed to provide him with a hearing on the suspension. However, at issue is a discretionary act by the Secretary which, if granted, would have extended the due diligence period of the lease.

The facts here are analogous to those in *Clouser v. Espy*, 42 F.3d 1522 (9th Cir.1994). There, plaintiffs held mining claims which had been subsumed in wilderness areas. Plaintiffs were denied motorized access to these claims. The Ninth Circuit held that plaintiffs were not denied a property right because no statutorily conferred property interest had been denied. *Id. at* 1540. Moreover, even if plaintiffs had established a property interest in the access to the claims, the Forest Service provided sufficient procedural due process by way of written pleadings. *Id. at* 1540.

Here, Hoyl has no property interest in the suspension. The property right granted to Hoyl was embodied in the three ten year federal coal leases. Although the grant or denial of a suspension affects Hoyl's property right, that determination is left to the discretion of the Secretary. Nothing in § 39 grants a lessee a property interest in a suspension. Moreover, as in *Clouser*, even if Hoyl has a protectable property interest in the suspension, he was afforded sufficient procedural protections through the IBLA appeals process.

### E. Violation of NEPA.

Hoyl contends that BLM violated the National Environmental Policy Act (NEPA) when it failed to take a "hard look" at the environmental consequences of its decision to grant or deny a suspension under § 7(b) or § 39. Although he did not raise this argument in the administrative process because an adequate record is before me, I will address it out of an abundance of caution.

Under NEPA, an agency is required to prepare an environmental impact statement (EIS) where a major Federal action will sig-

nificantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Where the environmental effects of a proposed action are uncertain, the agency must prepare an environmental assessment (EA) to consider alternatives. 42 U.S.C. § 4332(2)(E). The agency must either make a finding of "no significant impact" or determine if a significant environmental impact will result, thus requiring the preparation of an EIS. *Committee to Preserve Boomer Lake Park v. Department of Transp.*, 4 F.3d 1543, 1554 (10th Cir.1993). Because an EA prepared on the Hoyl federal leases in 1980 resulted in a finding of no significant impact, no EIS was necessary. Hoyl's reliance on *Getty Oil Co. v. Clark*, 614 F.Supp. 904, 919 (D.C.Wyo.1985), for the proposition that the Secretary is required to prepare and EIS in conjunction with an application for suspension is misplaced.

The 1980 EA evaluated the environmental impacts caused from the mining of the Hoyl federal leases. Contrary to the facts of *Getty Oil*, Hoyl does not contend that the BLM did not consider a "no action" alternative when it first issued Hoyl's federal leases. *Id. at* 920–21. Furthermore, in *Getty Oil* the federal land at issue was being considered for designation as wilderness land. Consequently, the environmental consequences from proposed drilling were potentially more severe. *Id. at* 917–18.

■ Here, the denial of suspension merely maintained the status quo. The EA prepared in 1980 determined that the proposed mining on the federal leases would have no significant environmental impact. Therefore, regardless of when or if mining occurred, under the facts of this case, the denial of suspension was not a major federal action. I conclude that BLM did not violate NEPA by failing to prepare an EIS on the suspension denial.

### F. Violation of the covenant of good faith and fair dealing.

Finally, Hoyl argues that BLM breached its duty of good faith and fair dealing when it acted contrary to its assurances. Hoyl cites no authority for the proposition that a discretionary act by the Secretary was a term of

the federal lease on which he can base an action sounding in contract. This contention in unfounded in the law.

Accordingly it is ORDERED that:

The determination of the IBLA is AF-FIRMED.